**METROPOLITAN LIFE INSURANCE COMPANY and Jefferson–Pilot Life Insurance Company, Plaintiffs,**

v.

**RJR NABISCO, INC. and F. Ross Johnson, Defendants.**

No. 88 Civ. 8266 (JMW).

United States District Court, S.D. New York.

June 9, 1989.

Philip Howard, Howard, Darby & Levin, New York City, for plaintiffs.

E. Michael Bradley, Scott Tross, Brown & Wood, New York City, for defendant RJR Nabisco.

Kenneth Logan, Michael Lamb, Simpson Thacher & Bartlett, New York City, for KKR.

## MEMORANDUM AND ORDER

WALKER, District Judge:

On April 28, 1989, the investment firm of Kohlberg Kravis Roberts & Company ("KKR") completed its $25 billion leveraged buy-out ("LBO") of defendant RJR Nabisco, Inc. ("RJR Nabisco" or "the company"). That unprecedented transaction continues to produce novel applications for relief. Defendant now moves for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a) and (b) to toll certain periods within which the company can cure an alleged default and to stay a Notice of Acceleration issued by plaintiff bondholders. For the reasons set forth below, RJR Nabisco's motion is granted in part and denied in part.

## I. BACKGROUND

Plaintiffs filed the present action in November of 1988, shortly after RJR Nabisco's then-Chief Executive Officer, F. Ross Johnson, proposed an LBO of the company. Following a bidding war among various investment groups, including the one led by Johnson, the company accepted an LBO proposal advanced by KKR. Plaintiffs hold roughly $350 million of the company's bonds, issued prior to the LBO. In the wake of Johnson's initial proposal and in light of the debt incurred to complete the transaction, plaintiffs claim that the value of their bonds dropped significantly. By an Opinion and Order dated May 31, 1989 ("Prior Opinion" or "Opinion"), 716 F.Supp. 1504, this Court granted defendants summary judgment on two counts in plaintiffs' Amended Complaint, judgment on the pleadings as to portions of another count, and dismissed for want of requisite particularity various fraud claims asserted by plaintiffs. Plaintiffs were given twenty days to replead. The Court's prior Opinion not only more fully sets forth the background to this action but also describes the parties with greater detail than will be repeated here. The Court presumes familiarity with its earlier Opinion.

The present motion traces its origins to six Notices of Default and one Notice of Acceleration issued by plaintiffs Metropolitan Life Insurance Company ("MetLife") and Jefferson–Pilot Life Insurance Company ("Jefferson–Pilot") in early May of this year. The Notice of Acceleration applies to MetLife's $10 million of bond holdings in Del Monte, a subsidiary of RJR Nabisco. Plaintiffs' six Notices of Default address roughly $170 million of their holdings in other bond issues of RJR Nabisco.[1] No

---

**1.** More specifically, the bond issues potentially subject to RJR Nabisco's requested injunction include the 8 percent Sinking Fund Debentures due January 15, 2007 (of which plaintiffs hold roughly $120 million) and the 8.9 percent Sinking Fund Debentures due October 1, 1996 (of which plaintiffs hold $50 million). In addition, MetLife has already accelerated the maturity of a 10.25 percent Note due 1990 of Del Monte Corporation guaranteed by RJR Nabisco ($10 million outstanding). *See* Tr. at 6; P. Mem. at 3 n. 2. The 8 percent Sinking Fund Debentures are governed by an Indenture dated as of April 1, 1977, between R.J. Reynolds Industries, Inc.,

Issuer, and Manufacturers Hanover Trust Company ("MHT"), Trustee, included as Bradley Aff. Exh. I ("the MHT Indenture"). The Court will refer to that typical indenture in its discussion of the matters implicated by plaintiffs' Notices of Default. No one disputes that the relevant provisions in the documents governing plaintiffs' holdings are virtually identical, *see, e.g.,* Bradley Aff. ¶¶ 13–14, with one significant exception: the April 1, 1984 Guarantee Agreement ("the Guarantee Agreement") that governs the Del Monte debt contains no cure period whatsoever. *Id.* ¶ 14.

questions are raised regarding alleged defaults as to a remaining $175 million of plaintiffs' bonds which are either (a) due to mature before the default periods expire ($100 million) or (b) covered by explicit procedural provisions requiring, before a Notice of Default can be issued, either the consent of the indenture Trustee, or that plaintiffs hold at least 25 percent of the outstanding bonds at issue ($75 million).

Plaintiffs based their Notices of Default and Acceleration on an alleged violation of the negative pledge provisions of the relevant indentures. A typical negative pledge covenant restricts mortgages or other liens on the assets of RJR Nabisco or its subsidiaries and protects the bondholders from being subordinated to other debt. The provision dictates that bondholders like plaintiffs be secured "equally and ratably." *See, e.g.*, Bradley Aff.Exh. I, § 4.06. The American Bar Foundation's *Commentaries on Indentures*, relied upon and respected by all parties, explains that

> [t]he negative pledge covenant is intended to prevent other creditors from obtaining priority over the debentureholders.... The possible encumbrance or claims which may create a priority over outstanding debentures ... may take a variety of forms.

*Id.* at 350. Plaintiffs apparently claim that, while there are no actual mortgages, liens or subordination agreements that trigger the negative pledge covenants, the post-LBO financial structure of RJR Nabisco amounts to a violation of that express guarantee. Defendant strenuously disputes that contention and, in response to plaintiffs' Notices, has counterclaimed for a declaratory judgment that it has not violated the negative pledge covenants in those debt issues.

To decide the present motion for injunctive relief, the Court must examine a separate express provision of the indentures between the parties. That provision provides for a so-called "cure period," during which time the company can remedy a violation of an express term of the indentures. Thus, the MHT Indenture defines as an Event of Default a

> failure on the part of the Company duly to observe or perform any other of the covenants or agreements on the part of the Company in the Debentures or in this Indenture contained for a period of 60 days after the date on which written notice specifying such failure and requiring the Company to remedy the same shall have been given to the Company by the [Trustee or holders of 25 percent of the bonds].

Bradley Aff.Exh. I, § 6.01(d). The other indentures presently at issue contain similar provisions, although their cure periods range from sixty to ninety days. As noted previously, the Del Monte Guarantee Agreement contains no express cure period whatsoever.

The procedure contemplated by these express provisions is clear. The Trustee or holders of twenty-five percent of the outstanding bonds can submit a Notice of Default, which triggers the cure period, during which time the company can cure the default. If the company believes it is not in default, then the company can seek a declaratory judgment that no default in fact has occurred. If a court agrees, then the bondholders' Notice becomes meaningless. If, however, a court disagrees with the company, then the company can cure its violation.

By its present motion, the company asks this Court to stay, or toll, the express cure periods in certain bond indentures pending this Court's analysis of the negative pledge provision. As the company contends, RJR Nabisco "should [not] be forced to give up its contractual right to a cure period in order to litigate the merits of whether

References throughout this Memorandum are as follows: Transcript of May 25, 1989 argument ("Tr."); Plaintiffs' Memorandum on Tolling ("P. Mem."); Plaintiffs' Reply Memorandum on Tolling ("P. Reply"); Defendant's Memorandum in Support of RJR Nabisco's Motion for a Preliminary Injunction ("D. Mem."); Defendant's Reply Memorandum ("D. Reply"); Affidavit of E. Michael Bradley ("Bradley Aff."); Affidavit of Paul E. Raether ("Raether Aff."); Exhibit ("Exh."); Defendant's Supplemental Answer and Counterclaim for Declaratory Judgment, Damages, and Injunctive Relief ("Counterclaim").

there has been a default." D. Reply at 4. The bondholders resist any tolling pending litigation on whether a default has occurred on the ground that the indentures do not provide for such relief, and that defendants should be held to their contracts.

In light of defendant's request for an expedited hearing, the Court heard oral argument on RJR Nabisco's motion on May 25, 1989. Subsequent to that argument, and by Order dated May 26, 1989, the Court requested the parties to brief the question of whether the Court should toll the cure periods.[2] Before it issued its May 26 Order, the Court had received only one letter apiece from both plaintiffs and defendant on this question. Based on the very incomplete record then before it, and relying on defendant's contention that plaintiffs' actions threatened to trigger cross-defaults of other RJR Nabisco debt instruments in the range of $16 to $19 billion, the Court entered a temporary restraint that not only tolled the cure periods but also stayed the effect of plaintiffs' Notice of Acceleration of the Del Monte debt for the brief period needed by the Court to determine that very question—namely, the appropriateness of a preliminary injunction ordering such a tolling and stay until the Court decides the underlying merits of the alleged default. Upon the representation of RJR Nabisco's counsel made in Court, the Court also enjoined defendant from selling certain assets subject to plaintiffs' notices of default until the Court had addressed the tolling question. The Court then agreed to decide upon further submissions the present motion for injunctive relief on an expedited basis.

Based upon the more complete record now before it, the Court can fully address defendant's application for a preliminary injunction.

---

**2.** Each brief submitted by the parties was to be no longer than ten pages. No one objected to that limitation. Indeed, at the May 25 argument, RJR Nabisco submitted a proposed order to toll the cure periods based on that morning's argument itself and the papers the company had filed that day, which the company clearly felt

## II. DISCUSSION

The standard for a preliminary injunction or a temporary restraining order pursuant to Fed.R.Civ.P. 65 is familiar. The party seeking such equitable relief must show a risk of irreparable harm and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make a fair ground for litigation and a balance of hardships tipping in the movant's favor. *The Video Trip Corporation v. Lightning Video, Inc.*, 866 F.2d 50 (2d Cir.1989).

### A. The Notices of Default and the cure periods:

If nothing else, the parties agree that RJR Nabisco has a right to cure in a timely fashion defaults under indentures that include explicit cure periods, and a right to seek a declaratory judgment that the negative pledge covenant has not been violated. In bringing its motion, however, RJR Nabisco confronts two immediate obstacles. First, the company cannot escape the fact that it was originally sued in the Southern District of New York, an unfortunate circumstance for any litigant inasmuch as this district remains the country's busiest. Given the caseload of each court in the district, motions cannot always be heard and decided before the expiration of an expressly bargained for contractual cure period.

Second, on its motion for a declaratory judgment the company confronts adversaries who seek substantial discovery. That remains plaintiffs' right, of course—although presumably they based their unequivocal Notices of Default and Acceleration on at least *some* already obtained information. Without explicitly providing for discovery, the Court's May 26, 1989 Order envisioned an expedited briefing schedule on the negative pledge covenants and the submission of the parties' reply papers by June 28, 1989, which is to say,

were sufficient to justify the equitable relief requested. In order to evaluate defendant's current position as fully and as fairly as possible, the Court has also considered the affidavits and voluminous supporting exhibits filed by defendant that day in support of its present motion.

sometime before the July 8 or so expiration of the earliest cure period. By letter dated June 1, 1989, counsel for plaintiffs sought "reconsideration of the Court's [briefing] order ... on the negative pledge clause issue [which] has the effect of precluding plaintiffs' opportunity for discovery on the claim." Letter of Philip K. Howard, Esq., to the Court, dated June 1, 1989, at 1. The Court granted plaintiffs' application, and directed the parties to stipulate to a revised discovery and briefing schedule. It now appears that plaintiffs seek significant discovery; by letter dated June 7, 1989, counsel for defendant informed the Court that "[p]laintiffs have indicated that, despite their opposition to tolling and irrespective of the Court's ruling on the tolling issue, they need four months of discovery." Letter of Kenneth R. Logan, Esq., to the Court, dated June 7, 1989, at 2–3. Plaintiffs do not dispute the facts set forth in the Logan letter.

Plaintiffs argue that the Court must not permit an extension of the cure periods to enable the borrower to litigate, since the parties never bargained for such an extension. They argue, in effect, that the provisions permit a lender, through a Notice of Default, to invite a borrower first to litigate a potential default, and then watch that litigation consume the borrower's expressly bargained for cure period. In fact, plaintiffs also seem to contend that the lender's own extensive discovery demands can further diminish or even completely deplete the time left in the cure periods. This Court finds it unreasonable for a lender not only to force an adversary to seek a judicial disposition of the lender's claim but also to take actions which delay that disposition, while at the same time demanding that its adversary act at its peril in seeking that very legal ruling. Such circumstances call for a practical and equitable resolution.

▮ Significantly, plaintiffs do not allege that RJR Nabisco's motion for a declaratory judgment is frivolous or was brought in less than good faith. Plaintiffs' silence on this score is easily understood; plaintiffs Notices were not sent, for instance, because the company simply refused to make

a necessary interest payment; rather, they are based upon an analysis of the *post hoc* financial structure of a company following the largest LBO in corporate history. As an empirical matter, most disputed defaults may be handled with ease and dispatch: either the borrower has made its monthly interest payments, for instance, or it has not. This is not the case here. The Court's review of the relevant loan and financing documents confirms the company's good faith in seeking to litigate its adversary's theory of default. *See, e.g.,* Raether Aff.Exh. A. The Court has no hesitation in concluding that RJR Nabisco's position on the negative pledge covenants raises sufficiently serious questions going to the merits to make a fair ground for litigation.

While plaintiffs have not questioned defendant's good faith, defendant has strenuously challenged plaintiffs' good faith, to say the least. *See, e.g.,* Counterclaim ¶¶ 109–110 ("[Plaintiffs] have conspired to send [their notices] ... without legal or factual bases, unreasonably, recklessly, maliciously and in bad faith ..."). While the Court leaves that issue to another day—and there appear to be more than a few days left to this litigation—it nonetheless notes, as does defendant, that "no creditor other than [plaintiffs] has declared a default under any of [the relevant] agreements." Bradley Aff. at 7 n. 1. Under the undisputed facts set forth above, this Court concludes that it would be inequitable to deny defendant its express, bargained for contractual right to cure. The Court thus concludes that, on the question of the express cure provisions, the balance of hardships tips decidedly in defendant's favor.

Plaintiffs contend that a borrower who has negotiated for explicit cure provisions must cure an alleged default even when the borrower retains a good faith basis that it has not defaulted on its agreements. That position is unpersuasive. To hold otherwise would, in effect, compel RJR Nabisco to assert its good faith claim at its peril. On the one hand, RJR Nabisco could cure the alleged breach. By doing so, however, the company would forfeit its right to pursue its good faith defense to the alleged

default. On the other hand, RJR Nabisco could choose not to cure and instead pursue its substantial legal claim. If, however, its defense ultimately fails, then it would lose its opportunity to cure and face extraordinary loss. This choice—which compels RJR Nabisco to pursue its good faith legal claim at the expense of its right to cure—defeats the purpose of the cure periods and, under the peculiar circumstances of this case, thus represents irreparable harm. Accordingly, the Court grants defendant's motion for a preliminary injunction tolling the explicit cure provisions at issue.

The Court notes that its holding is consonant with a line of New York cases that tolls cure periods like those at issue under standards for equitable relief more relaxed than those just applied by the Court. The so-called *Yellowstone* injunction orginated in *First National Stores, Inc. v. Yellowstone Shopping Center, Inc.*, 21 N.Y.2d 630, 290 N.Y.S.2d 721, 237 N.E.2d 868 (1968), in which ironically the court denied the equitable relief sought. The *Yellowstone* case involved a landlord-tenant dispute. There, the landlord contended that the tenant was required to bear the costs of certain improvements to the property. The tenant's failure to provide the funds, the landlord alleged, constituted a contractual breach, which if not remedied within the ten day cure period set forth in the lease, would terminate the tenancy. The tenant failed to cure and the matter was litigated. Ultimately, the court not only upheld the landlord's interpretation of the lease, which had by then expired, but also refused to revive the already terminated lease. *Yellowstone*, 290 N.Y.S.2d at 725, 237 N.E.2d at 871.

The New York Court of Appeals recently explained the history, purpose and standard for a so-called *Yellowstone* injunction:

We held [in *Yellowstone* ] that under [the circumstances present in that case] the courts were powerless to revive the expired lease. As a result, tenants developed the practice of obtaining a stay of the cure period before it expired to preserve the lease until the merits of the dispute could be settled in court [the so-called *Yellowstone* injunction]. The alternative for the tenant was to stand on his rights without correcting the violation, wait for the landlord to start summary proceedings in Civil Court and then defend against the landlord's claim in that court. If he won, well and good; if he lost he forfeited everything because the lease had terminated. The remedy for this all or nothing result was to obtain a stay to toll the running of the cure period and the expiration of the lease ... Whatever [the] merits [of *Yellowstone* injunctions], the courts have granted them routinely to avoid forfeiture of the tenant's interest and in doing so they accepted far less than the normal showing required for preliminary injunctive relief. An applicant rarely has been required to demonstrate ... irreparable injury [and the additional, familiar standards applicable to Fed.R.Civ.P. 65] ... The threat of termination of the lease and forfeiture, standing alone, has been sufficient to permit maintenance of the *status quo* by injunction.

*Post v. 120 East End Avenue Corporation,* 62 N.Y.2d 19, 475 N.Y.S.2d 821, 823, 464 N.E.2d 125, 127 (1984).

For all practical purposes, *Yellowstone* injunctions have been exclusively limited to the landlord-tenant context. But the animating principle of such equitable relief need not be so limited and restricted. The same concerns that motivate courts to grant a *Yellowstone* injunction are present here. Just as the law does not favor forfeiture of a leasehold, *see, e.g., Vanguard Diversified, Inc. v. The Review Company,* 35 A.D.2d 102, 313 N.Y.S.2d 269, 272 (2d Dep't 1970), so too should the law frown upon significant and potentially unnecessary defaults where a party has expressly bargained for a grace period during which time it can remedy inadvertent or intentional breaches of its obligations—so long as that party has a substantial and good faith basis for believing that no breach has occurred.

### B. The Del Monte Notice of Acceleration:

The Del Monte indebtedness presents a different factual situation. RJR Nabisco

readily admits that the Del Monte Guarantee Agreement contains no cure period. *See, e.g.,* D.Mem. at 5 n. 4. The company nevertheless seeks injunctive relief that would stay the effect of plaintiffs' Notice of Acceleration. Defendant moves pursuant both to Fed.R.Civ.P. 65 and *Yellowstone* and its progeny. The Court rejects each purported basis for the relief sought.

1. Yellowstone and the Del Monte Notice:

■ As plaintiffs note, the court in *Yellowstone* itself held that it was "powerless" to revive a contract which "had been terminated in strict accordance with its terms," "absent a showing of fraud, mutual mistake or other acceptable basis of reformation." *Yellowstone,* 290 N.Y.S.2d at 725, 237 N.E.2d at 871. No case cited by defendant is to the contrary. Instead, and again as plaintiffs note, the cases relied upon by defendant involved cure periods informally agreed to before the termination of the lease became effective. *See, e.g., Wuertz v. Cowne,* 65 A.D.2d 528, 409 N.Y.S.2d 232, 233 (1st Dep't 1978) ("The lease here does not provide for a curing period. *The parties themselves, however, viewed the period between the issuance of the landlord's notice [February 1978] and the date of its effect [April 1978] as a time within which the plaintiff could have cured any default."*) (emphasis added). Defendant here relies exclusively on a letter written by plaintiffs' counsel in which the latter explained that "MetLife will be happy to consider withdrawing the notices of Default and Acceleration [if the alleged violation is remedied]." Letter of Philip K. Howard, Esq., to Kenneth R. Logan, Esq., dated May 10, 1989, at 2. That letter—an obvious, and welcome, attempt to settle this dispute—cannot reasonably be seen as an admission or agreement that the Del Monte debt is subject to a cure period, and this Court will not find one.

2. Traditional equitable relief:

Defendant cannot forget that the relief it presently seeks pursuant to Fed.R.Civ.P. 65 "is an extraordinary and drastic remedy which should not be routinely granted," *Medical Society of the State of New York v. Toia,* 560 F.2d 535 (2d Cir.1977), and "will not issue as a matter of right, but is subject to the exercise of the sound discretion of the Court after a careful review of the underlying equities." *Johanna Farms, Inc. v. Citrus Bowl, Inc.,* 468 F.Supp. 866, 873 (E.D.N.Y.1978) (citing *Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 674, 88 L.Ed. 834 (1944). Indeed, the award of an injunction "has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff." *United States v. Bedford Associates,* 618 F.2d 904 (2d Cir. 1980) (citation omitted), *cert. denied,* 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982). After carefully reviewing the relevant evidence and arguments, this Court concludes that defendant has not met its heavy burden. As far as the Del Monte Notice is concerned, the company has failed to show a risk of a genuinely irreparable harm.

■ In short, defendant argues that plaintiffs' actions threaten "the risk of grave harm to RJR Nabisco" arising from potential cross-defaults of other indebtedness. MetLife's Notice of Acceleration of its Del Monte holdings, defendant argues,

> threatens to cause irreparable injury ... This acceleration, *if proper,* would trigger cross-default clauses in at least $67 million of other outstanding RJR Nabisco indebtedness. Unless redeemed, this cross-default would trigger further cross-defaults in over $800 million of outstanding European debt, followed by the acceleration of $16 billion to $18.75 billion of buy-out financing.

Counterclaim ¶ 102 (emphasis added).

An examination of submitted loan instruments, however, reveals that this "risk of grave harm" does not arise simply from MetLife's Notice of Acceleration, as defendant itself recognizes; it carefully notes, for instance, that the acceleration would trigger cross-defaults only "if proper." *Id.* Moreover, the chain reaction imagined by defendant includes, as a necessary first link, a cross-default under the Mediocredito

Centrale Loan Agreement ("the Mediocredito Agreement"). *See* Bradley Aff.Exh.M. By its express terms, the Mediocredito Agreement defines, as an event of default that would trigger *its own* cure period, the point at which "any other indebtedness of [RJR Nabisco] ... becomes or is declared due prematurely *by reason of a default*." Bradley Aff.Exh.M. § 11.1.5 (emphasis added). Having carefully reviewed that document, the Court has concluded that this quoted provision envisions as an event of default a *judgment* of default, not merely plaintiffs' Notice of Acceleration. If the company prevails on its motion for declaratory relief, no indebtedness will have "become or [been] declared due." If, on the other hand, the company loses on the merits, then the Mediocredito cross-default provisions, with a cure period, will properly have been triggered.

The LBO Credit Agreement similarly undermines defendant's position. It contains an explicit cross-default exemption relevant to the present motion. That agreement provides, in relevant part,

> that no Event of Default shall arise under this Section ... *in respect of Prepayable Debt* unless such Prepayable Debt ... *is not being contested in appropriate proceedings being duly prusued* ...

Raether Aff.Exh.A, § 10.04 (emphasis added). Elsewhere in the Credit Agreement "prepayable debt" is defined to mean

> any Existing Debt (i) that may be accelerated or may be caused to become due prior to its stated maturity as a direct result of the [LBO] and/or the financing thereof or (ii) with respect to which [the KKR holding company established to effect the LBO] reasonably believes it is in the best interest of [RJR Nabisco] and its Subsidiaries to prepay prior to its stated maturity, *provided that the aggregate principal amount of Prepayable Debt shall not exceed $500,000,000.*

Raether Aff.Exh.A., at 70 (emphasis added). In other words, the Del Monte holdings presently at issue fall precisely within

the "prepayable debt" exemption. Indeed, that provision may have been negotiated by RJR Nabisco with just the sort of action plaintiffs have now taken in mind.

Defendant nowhere disputes this reading of its own Credit Agreement.[3] Instead, defendant merely relies on this wan argument:

> Plaintiffs cavalierly assure the Court that RJR Nabisco is "misreading its own loan agreements" and that "if RJR Nabisco prevails on the merits, no cross-default clauses will have been triggered." ... RJR Nabisco finds no solace in plaintiffs' empty assurances. As the Court noted during the hearing, a default may be in the eye of the beholder ...

D. Reply at 3 (citations omitted). Relying on the Court's pedagogical prodding of counsel is no substitute for the showing necessary for the extraordinary equitable relief defendant now seeks.

The harm envisioned by defendant remains too speculative to support its motion. Indeed, in its earlier motion, the company argued that

> [t]he Second Circuit has rejected the argument that irreparable harm need only be "possible," holding that it must be highly probable and imminent. *See, e.g., Jack Kahn Music Co.* [*v. Baldwin Piano & Organ Co.,*] 604 F.2d [755] at 759 ... [2 Cir.1979] [A] preliminary injunction can be predicated "only on the basis of a showing that the alleged ... harm [is] not remote or speculative ..."

Defendants' Memorandum in Opposition, filed February 6, 1989, at 48 (citation omitted). The company nowhere suggests that any other holder has sent a Notice of Default since plaintiffs first sent their Notices. Indeed, the contrary is true, as defendant notes: "[s]ignificantly, no creditor other than MetLife and Jefferson–Pilot has declared a default under any of these agreements." Bradley Aff. at 7 n. 1. Not only is the threatened harm speculative, but the company also ignores the significant protections afforded by the Trustee demand provisions in certain indentures.

---

**3.** Plaintiffs raised this issue in their initial brief filed on May 31, 1989. Defendant's reply memorandum, filed on June 2, 1989, conspicuously avoids a response.

Indenture Trustees, presumably, are not selected for their proclivity to issue frivolous Notices of Default or Acceleration. As far as the Del Monte Notice of Acceleration is concerned, RJR Nabisco does not face irreparable harm; it simply confronts the more limited fruits of an agreement for which it freely bargained.[4]

Nothing prevented defendant from seeking a declaratory judgment before the completion of the April 28 RJR Nabisco-KKR merger, especially since plaintiffs had forewarned defendant that they intended to examine the ultimate financing documents with care. *See, e.g.*, Plaintiffs' Reply Memorandum, filed February 13, 1989, at 12 n. 7; Plaintiffs' Rule 3(g) Counterstatement, filed February 6, 1989, ¶ 9. This Court certainly does not recommend such preemptive strikes before every transaction. But the RJR Nabisco LBO was no everyday, ordinary transaction. In certain respects, it remains unprecedented. Sophisticated institutions like RJR Nabisco and KKR, counseled by staffs of legal and financial advisors, doubtlessly recognized that their financing arrangements would be subjected to extraordinary scrutiny. Further, any harm is compensable in damages, as defendant itself has recognized by advancing a plethora of legal theories in its Counterclaim.

Equally important, as all parties presently before the Court have previously realized and argued, the function of equity is to redress unfairness in the *context of all the facts.*[5] On a prior motion, addressed by the Court's previous Opinion, plaintiffs attempted to add a new, substantive, unbargained for term, never within the mutual contemplation of the parties, into their bond indentures through a superficially appealing but legally insufficient implied covenant of good faith and fair dealing. Defendant contended, and the Court agreed, that plaintiffs' argument failed to help sophisticated financial institutions that remained willing participants in a largely impersonal market, particularly where those same parties, in other contexts, had expressly bargained for the rights plaintiffs sought to imply. By its holding, the Court determined—as defendant urged—that the terms of standard indentures, relied upon throughout the market and clear on their face, should not be varied from case to case depending on the subjective expectations of sophisticated investors.

Casting its prior arguments to the wind, defendant now seeks to squeeze into one of those very same agreements a new, substantive, unbargained for term—a cure period—never within the mutual contemplation of the parties, under the superficially appealing guise of a motion for either a *Yellowstone* injunction or traditional equitable relief. Defendant pursues this course even though, in other contexts, it has expressly bargained for the precise right it now seeks, in effect, to imply. Defendant thus seeks to avoid the explicit meaning of the very agreement which it previously—and successfully—argued exclusively governed its relationship with plaintiffs. Unsurprisingly, the company chooses to describe its current action neither as an end run around its limited contractual rights, nor as an attempt to insert a new provision that permits a cure period, but rather as a motion for equitable relief. Given the undisputed background to this litigation and the facts of this case, however, as well as the sophistication of these

---

**4.** Defendant's reliance on cases like *Givenchy S.A. v. William Stuart Industries (Far East) Ltd.,* No. 85–9911, 1986 WL 3358 (S.D.N.Y. March 10, 1986) is misplaced. That case simply found irreparable harm in a threatened termination of a licensing agreement, a traditional context for equitable relief. As the Second Circuit explained in *Roso–Lino Beverage Distributors, Inc. v. Coca–Cola Bottling Co.,* 749 F.2d 124, 125–6 (2d Cir.1984), "The loss of [a] distributorship, an ongoing business representing many years of effort and the livelihood of its husband and wife owners, constitutes irreparable harm. What

[movant] stands to lose cannot be fully compensated by subsequent monetary damages ... [Movant] stands to lose [its] business forever." On their facts, those cases are clearly inapposite. Further, this Court has found no irreparable harm with regard to the Del Monte Notice.

**5.** *See* submissions filed by the parties on prior motions decided by Court's earlier Opinion: Plaintiffs' Opposition Memorandum, filed February 6, 1989, at 44; Defendants' Reply Memorandum, filed February 13, 1989, at 18.

parties,[6] equity dictates that RJR Nabisco, like plaintiffs before it, be held to the express terms of the Del Monte Guarantee Agreement it freely negotiated and accepted with open eyes.[7]

## III. CONCLUSION

The Court's Order dated May 26, 1989 is vacated in its entirety. The explicit cure periods in the relevant indentures shall be tolled from May 26 until the court decides defendant's underlying motion for a declaratory judgment. The effect of MetLife's Notice of Acceleration is no longer stayed as of the date of this Order. At least on the record currently before the Court, plaintiffs have not demonstrated a risk of irreparable harm due to the tolling of the cure provisions. Accordingly, the restrictions formerly placed on asset sales by defendant are hereby removed.

The Court has been advised by counsel that the parties will soon stipulate to a discovery and briefing schedule to address defendant's motion for a declaratory judgment. The Court will hear and decide defendant's motion according to the Court's standard practice in a case where the movant has failed to establish a risk of irreparable harm. After the motion has been briefed, the parties may request that oral argument be heard. Sometime after that, the Court will render its decision.

SO ORDERED.

---

6. *See generally* Prior Opinion.

7. There is nothing inconsistent with a refusal to read an implied cure period into the Del Monte Guarantee Agreement and extending cure periods in other indentures pending litigation on the default question. Where cure periods are present, by extending them the Court merely gives effect to the express intention of the par-

ties that a cure option be available. *See* Prior Opinion, 716 F.Supp. at 1516–18 and cases discussed therein. Where such a provision is not present, the Court similarly honors the parties' agreed intent that there be no cure period.

Moreover, the Court based its preliminary injunction as to the express cure periods on traditional grounds for such relief, as is explained above.