906 F.2d 884
 METROPOLITAN LIFE INSURANCE COMPANY and Jefferson-Pilot Life
Insurance Company, Plaintiffs-Appellants,
v.
RJR NABISCO, INCORPORATED and F. Ross Johnson, Defendants,
RJR Nabisco, Incorporated, Defendant-Appellee.
 No. 404, Docket 89-7688.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 4, 1990.
Decided June 25, 1990.
 
 Philip K. Howard, New York City (Warren G. Caywood, Jr., Vivien Shelanski, David W. Haller, Howard, Darby & Levin, Harry P. Kamen, George K. Fenn, Jr., Nancy Mayer, Metropolitan Life Ins. Co. Law Dept., New York City, on the brief), for plaintiffs-appellants.
 Kenneth R. Logan, New York City (Simpson Thacher & Bartlett, E. Michael Bradley, Brown & Wood, New York City, on the brief), for defendant-appellee.
 Before KEARSE and WINTER, Circuit Judges, and LEVAL, District Judge.*
 KEARSE, Circuit Judge:
 
 
 1
 This appeal arises out of litigation stemming from the $25 billion leveraged buy-out ("LBO") of defendant RJR Nabisco, Incorporated ("RJR" or the "Company") by the investment firm of Kohlberg Kravis Roberts & Company ("KKR"). Plaintiffs Metropolitan Life Insurance Company ("MetLife") and Jefferson-Pilot Life Insurance Company ("Jefferson-Pilot") appeal from so much of an order of the United States District Court for the Southern District of New York, John M. Walker, then-District Judge, as granted a motion by RJR for an injunction tolling the running of contractual cure periods contained in indentures governing various RJR notes and debentures held by plaintiffs, pending adjudication of RJR's contention that there had been no default such as to trigger the cure periods. 716 F.Supp. 1526 (1989). On appeal, plaintiffs contend principally that (1) the injunction impermissibly altered the parties' agreements, and (2) RJR failed to meet the requirements for preliminary injunctive relief. We agree that the district court did not give effect to the clear terms of the indentures, and we therefore vacate the order tolling the cure periods and remand for further proceedings.
 
 I. BACKGROUND
 
 2
 Between 1975 and 1988, RJR issued at least nine series of notes and debentures (the "debt securities"). Plaintiffs, together with their subsidiaries, purchased notes and debentures in several of these series; by the fall of 1988, MetLife held approximately $340 million of these securities, and Jefferson-Pilot held approximately $9.3 million.
 
 A. The Default and Cure Provisions
 
 3
 Each series of the debt securities was subject to one of four indentures dated April 1, 1977, June 15, 1982, October 15, 1982, or March 1, 1987. Each of the indentures included among its terms a so-called negative pledge covenant that prohibited RJR from mortgaging or pledging certain assets to secure other indebtedness unless the securities covered by the indenture were secured "equally and ratably with all indebtedness secured by such mortgage or pledge." (E.g., October 15, 1982 indenture Sec. 3.7; April 1, 1977 indenture Sec. 4.06). Each indenture also provided for a period during which RJR could cure a breach of the negative pledge covenant.
 
 
 4
 The two indentures at issue on this appeal are those dated October 15, 1982 and April 1, 1977. The cure provision of the October 15, 1982 indenture, insofar as it related to the negative pledge covenant, provided as follows:
 
 
 5
 In case one or more of the following Events of Default with respect to Securities ... shall have occurred and be continuing, that is to say:
 
 
 6
 ....
 
 
 7
 (d) failure on the part of the Issuer duly to observe or perform any other of the covenants or agreements on the part of the Issuer in the Securities or in this Indenture contained for a period of 90 days after the date on which written notice specifying such failure, stating that such notice is a "Notice of Default" hereunder and demanding that the Issuer remedy the same, shall have been given ... to the Issuer and the Trustee by the holders of at least 25% in aggregate principal amount of the Securities at the time Outstanding; ...
 
 
 8
 ....
 
 
 9
 ... If an Event of Default described in clause (d) ... occurs and is continuing, then and in each and every such case, unless the principal of all the Securities shall have already become due and payable, either the Trustee or the Holders of not less than 25% in aggregate principal amount of all the Securities then Outstanding hereunder ... by notice in writing to the Issuer ... may declare the entire principal ... of all the Securities then Outstanding and interest accrued thereon, if any, to be due and payable immediately, and upon any such declaration the same shall become immediately due and payable.
 
 
 10
 (October 15, 1982 indenture Sec. 5.1). Section 6.01 of the April 1, 1977 indenture was substantially identical, except that it provided only a 60-day cure period. The pertinent cure provisions of the June 15, 1982 and March 1, 1987 indentures were identical to or substantially in accordance with those of the October 15, 1982 indenture, providing for a 90-day period after receipt of a Notice of Default during which RJR could cure a default with respect to the negative pledge covenant.
 
 
 11
 In the fall of 1988, MetLife also held a $10 million note of RJR subsidiary Del Monte Corporation ("Del Monte") which was guaranteed by RJR and governed by a Guarantee and Amended Agreement dated April 1, 1984 (the "Del Monte Agreement"). The Del Monte Agreement contained a restriction, similar to the negative pledge covenants in the indentures, on RJR's pledging or mortgaging of assets. Unlike the indentures, however, the Del Monte Agreement did not require any Notice of Default before the note could be accelerated, and it did not provide for a period in which default could be cured.
 
 B. The LBO and the Notices of Default
 
 12
 In October 1988, defendant F. Ross Johnson, then RJR's Chief Executive Officer, proposed to RJR an LBO of the Company's stockholders. This proposal sparked a bidding war for the Company that was concluded on December 1, 1988, when the Company accepted a bid from KKR.
 
 
 13
 After the announcement of the LBO, the RJR debt securities, previously rated "A", lost their "A" ratings. On November 17, 1988, anticipating that any LBO would seriously erode the value of the debt securities, MetLife commenced the present action against RJR and Johnson in New York State court alleging, inter alia, fraudulent conveyances and breach of implied covenants of good faith and fair dealing. RJR promptly removed the action to the district court, whereupon MetLife, now joined by Jefferson-Pilot, filed an amended complaint which added allegations of, inter alia, securities laws violations and fraud.
 
 
 14
 In January 1989, plaintiffs moved for summary judgment or, in the alternative, for a preliminary injunction prohibiting RJR from encumbering its assets unless it posted sufficient security to enable it to redeem the debt securities. RJR cross-moved for, inter alia, judgment on the pleadings dismissing parts of the complaint.
 
 
 15
 While these motions were pending, the LBO was completed, and RJR was merged into a KKR affiliate on April 28, 1989. Permanent financing for the LBO included bank loans of up to $12.75 billion pursuant to a credit agreement, and $5 billion of subordinated debt. The bank loan agreements required RJR to sell RJR assets valued at $5.5 billion and use the proceeds to repay some $5.5 billion of the LBO financing.
 
 
 16
 On May 8 and 10, while the parties' motions were still sub judice, plaintiffs sent RJR six Notices of Default pursuant to the indentures. The Notices alleged that the LBO financing arrangements requiring RJR to sell $5.5 billion in RJR assets and use the proceeds to repay LBO lenders were tantamount to a pledge of those assets to the LBO lenders without equal and ratable security for the holders of the securities covered by the indentures, and that these arrangements therefore violated the negative pledge covenants. MetLife also sent a Notice of Acceleration with respect to the $10 million Del Monte note. On May 9, RJR notified plaintiffs of its view that there had been no default and asked plaintiffs to rescind the Notices. Plaintiffs refused.
 
 
 17
 RJR moved in the district court for a preliminary injunction tolling the periods during which it could cure the alleged defaults. Eventually, it filed a counterclaim seeking, inter alia, (1) a declaratory judgment that the Notices of Default and Notice of Acceleration were invalid and that there was no default, and (2) damages for plaintiffs' "unreasonabl[e], reckless[ ], malicious[ ] and ... bad faith sending [of] the improper notices for the purpose of injuring RJR."
 
 C. The Decision of the District Court
 
 18
 In an order dated May 26 ("May 26 Order"), the district court temporarily enjoined RJR from selling assets that were subject to the negative pledge covenant, to the extent that the proceeds were to be dedicated to repaying the LBO lenders, until the court could address the tolling issue. The May 26 Order set an expedited briefing schedule for RJR's motion, envisioning decision of the motion before July 8 and the expiration of the earliest cure period. Plaintiffs, however, sought reconsideration of the schedule, stating that it had the effect of precluding any opportunity for plaintiffs to have discovery on the claim. Plaintiffs apparently asserted that they needed some four months of discovery--a period that obviously exceeded the cure periods.
 
 
 19
 In a Memorandum and Order dated June 9, 1989 ("June 9 Order"), the district court vacated the stay against RJR's sales of assets and granted so much of RJR's motion as sought tolling of the cure periods in the April 1, 1977 and October 15, 1982 indentures until the court could decide RJR's counterclaim for a declaratory judgment. The court found it
 
 
 20
 unreasonable for a lender not only to force an adversary to seek a judicial disposition of the lender's claim but also to take actions which delay that disposition, while at the same time demanding that its adversary act at its peril in seeking that very legal ruling. Such circumstances call for a practical and equitable resolution.
 
 
 21
 June 9 Order, 716 F.Supp. at 1530.
 
 
 22
 Relying on landlord-tenant cases in which New York State courts had granted stays to tenants threatened with eviction by landlords claiming defaults, though noting that such injunctions "have been exclusively limited to the landlord-tenant context," the court stated that
 
 
 23
 the animating principle of such equitable relief need not be so limited and restricted.... Just as the law does not favor forfeiture of a leasehold, ... so too should the law frown upon significant and potentially unnecessary defaults where a party has expressly bargained for a grace period during which time it can remedy inadvertent or intentional breaches of its obligations--so long as that party has a substantial and good faith basis for believing that no breach has occurred.
 
 
 24
 Id. at 1531.
 
 The court stated that
 
 25
 [a]s an empirical matter, most disputed defaults may be handled with ease and dispatch: either the borrower has made its monthly interest payments, for instance, or it has not. This is not the case here.
 
 
 26
 Id. at 1530. The court found that RJR's attempt to litigate the notices of default was in good faith; it "le[ft] ... to another day" a determination of RJR's challenge to plaintiffs' good faith; and it "conclude[d] that it would be inequitable to deny defendant its express, bargained for contractual right to cure." Id. at 1530.
 
 
 27
 The court apparently did not toll the cure periods with respect to securities governed by the June 15, 1982 and March 1, 1987 indentures, in part because they would reach maturity before the expiration of the cure period and in part because as to certain series plaintiffs did not hold a sufficiently large percentage to entitle them to issue a Notice of Default. See id. at 1528 ("No questions are raised regarding alleged defaults as to a remaining $175 million of plaintiffs' bonds which are either (a) due to mature before the default periods expire ($100 million) or (b) covered by explicit procedural provisions requiring, before a Notice of Default can be issued, either the consent of the indenture Trustee, or that plaintiffs hold at least 25 percent of the outstanding bonds at issue ($75 million)."). The court denied RJR relief with respect to the Notice of Acceleration covering the Del Monte note, observing that the Del Monte Agreement did not provide any cure period. The court stated that
 
 
 28
 [t]here is nothing inconsistent with a refusal to read an implied cure period into the Del Monte Guarantee Agreement and extending cure periods in other indentures pending litigation on the default question. Where cure periods are present, by extending them the Court merely gives effect to the express intention of the parties that a cure option be available.
 
 
 29
 Id. at 1535 n. 7.
 
 
 30
 Plaintiffs have appealed so much of the June 9 Order as tolled the cure periods with respect to the April 1, 1977 and October 15, 1982 indentures. For the reasons below, we vacate the challenged portions of that order.
 
 II. DISCUSSION
 
 31
 As an initial matter, we note that the June 9 stay, though styled a preliminary injunction, is more appropriately considered a final order appealable under the Cohen doctrine, see Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949); see also Coopers & Lybrand v. Livesay, 437 U.S. 463, 468-69, 98 S.Ct. 2454, 2457-58, 57 L.Ed.2d 351 (1978). The June 9 Order determined with finality the matter of whether the cure periods provided by the indentures may be expanded by order of the court. The district court clearly contemplated that all subsequent proceedings before it would be concerned exclusively with whether a breach of the negative pledge covenants had occurred, the cure issue having been fully resolved. Thus, the June 9 Order conclusively determined a question that (a) is collateral to the rights asserted in the action, (b) is too important to be denied review, and (c) would be mooted by the postponement of review until the final judgment in the action. As a final collateral order, of course, the June 9 ruling is subject to plenary review. We conclude that it was based on an erroneous application of law.
 
 
 32
 In a contract action, the court's general objective should be to give effect to the intentions of the parties in entering into the agreements. See, e.g., Hartford Accident & Indemnity Co. v. Wesolowski, 33 N.Y.2d 169, 171-72, 350 N.Y.S.2d 895, 898, 305 N.E.2d 907, 910 (1973); Morlee Sales Corp. v. Manufacturers Trust Co., 9 N.Y.2d 16, 19, 210 N.Y.S.2d 516, 518, 172 N.E.2d 280, 282 (1961); 4 S. Williston, Williston on Contracts Sec. 600, at 280 (3d ed.1961). Under New York law, which governs the indentures at issue here, if a contract is unambiguous on its face, its proper construction is a question of law. United States Naval Institute v. Charter Communications, Inc., 875 F.2d 1044, 1048 (2d Cir.1989).
 
 
 33
 Contract language is unambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." Breed v. Insurance Co. of North America, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280, 1283 (1978). Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation. Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir.1989). The court should not find the language ambiguous on the basis of the interpretation urged by one party, where that interpretation would "strain[ ] the contract language beyond its reasonable and ordinary meaning." Bethlehem Steel Co. v. Turner Construction Co., 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 93, 141 N.E.2d 590, 593 (1957).
 
 
 34
 The parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable. In its efforts to preserve the parties' rights and the status quo, the court must be careful not to alter the terms of the agreement. "The parties having agreed upon their own terms and conditions, 'the courts cannot change them and must not permit them to be violated or disregarded.' " Diversified Mortgage Investors v. U.S. Life Title Ins. Co. of New York, 544 F.2d 571, 575 (2d Cir.1976) (quoting Whiteside v. North American Accident Ins. Co., 200 N.Y. 320, 326, 93 N.E. 948 (1911)).
 
 
 35
 The district court did not follow these prescriptions in the present case. The cure provisions at issue here are unambiguous. They state explicitly that if holders of 25 percent or more of the subject securities serve a notice of default denominated as such, and RJR fails to perform the covenants for a stated number of days thereafter--90 days in the October 15, 1982 indenture, 60 days in the April 1, 1977 indenture--those holders may declare the outstanding principal and interest immediately due and payable. There is no mention in either indenture of a period for adjudication of any notice of default. Nor is there any mention of an automatic extension of the cure period in the event of litigation over the merits of the default notice or of a right on the part of RJR to seek an extension from the court.
 
 
 36
 In tolling the cure periods pending adjudication of the merits of the default notice, therefore, the court plainly departed from the express terms of the indentures. Though the court's statement that "it would be inequitable to deny [RJR] its express, bargained for contractual right to cure" is true, it is no less inequitable to deny the lenders their express, bargained-for, contractual limitation on the period during which cure may be effected. Thus, we reject the district court's view that "[w]here cure periods are present, by extending them the Court merely gives effect to the express intention of the parties that a cure option be available." Where the parties have expressly agreed that the availability of a cure period shall be temporally limited, the court does not give effect to the parties' intention by removing the time limitation.
 
 
 37
 Here, the right to cure that was bargained for and expressly given to RJR was not, in the indentures, measured by the time required to obtain an adjudication of the merits of a notice of default. Any suggestion that RJR bargained for and obtained a period to cure of longer than the period expressly and unambiguously provided in the indentures is wrong as a matter of law. The court's June 9 Order, rather than "merely giv[ing] effect to the express intention of the parties," rewrote the cure provision in the October 15 indenture to give RJR the opportunity to cure until "the expiration of 90 days or the expiration of sufficient time to obtain a declaratory judgment as to whether or not there was a default, whichever occurs later."
 
 
 38
 Though this reconstruction may have been the "practical" resolution sought by the district court, it was not authorized by any body of applicable law. To the extent that the court relied on the real estate law of New York, that reliance was misplaced. We have found no indication that the state courts of New York have granted stays tolling cure-period type provisions except in landlord-tenant matters, where, because of the unique nature of real estate, the absence of a stay would result in a forfeiture. See, e.g., Post v. 120 East End Avenue Corp., 62 N.Y.2d 19, 475 N.Y.S.2d 821, 464 N.E.2d 125 (1984); First National Stores, Inc. v. Yellowstone Shopping Center, Inc., 21 N.Y.2d 630, 290 N.Y.S.2d 721, 237 N.E.2d 868 (1968). We do not agree with the district court's extension of this line of cases to standard form indentures, see American Bar Foundation, Commentaries on Indentures 204, 207, 217 (1971) ("Commentaries"), such as those used here. We conclude that its interpretation of the indentures as permitting an extension of the cure periods until the merits of the default notices could be adjudicated was at odds with the indentures' unambiguous cure provisions, and thus was impermissible.
 
 
 39
 In support of its contention that the cure provisions at issue here are ambiguous because the parties could have included a clause expressly prohibiting the borrower from seeking injunctive relief from the agreed time limitations, the dissent relies in part on a clause in the American Bar Foundation's Model Debenture Indenture Provisions and Commentaries, which the dissent quotes as allowing the lender to obtain a covenant that " 'it will not at any time ... plead, ... claim or take the benefit ... of, any stay....' " Dissenting opinion, post at 892 (all ellipses in dissent). We believe the dissent has misread that standard clause, which to us appears directed toward stays imposed by statutory law. The model provision reads as follows:
 
 
 40
 The Company covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and the Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.
 
 
 41
 Commentaries at 242-45 (emphasis added); see also R. Landau, Corporate Trust Administration and Management 179 (3d ed.1985).
 
 
 42
 Nor are we persuaded by the dissent's assertion that "well-known" "modern equity practice" routinely enjoins the effective date of cure provisions. No cases of that nature have been cited to us, nor have we uncovered any through independent research. If such a modern equity practice existed, it would not have been necessary for the district court and the parties to have discussed at such length New York decisions such as Yellowstone that are limited to landlord-tenant relations.
 
 
 43
 We concede without apology that we believe contract provisions specifying 60-day periods mean 60 days rather than 60 days plus an additional period calculated by the length of the chancellor's foot. We do not agree, therefore, with the dissent's view that a contractual provision specifying a cure period of 60 days sets only a minimum period subject to routine judicial extensions that could last for years. Finally, we reiterate our view that an extension such as that granted here is not a preliminary injunction preserving the status quo, but rather one that radically alters that status by permanently changing the cure provisions.
 
 
 44
 There is, of course, nothing in the indentures to prevent RJR from seeking an adjudication of the merits of the notice of default. But since the length of the cure periods is clearly and unambiguously specified, RJR assumes the risk that the cure period will expire before a decision is rendered.
 
 
 45
 This does not mean, however, that the lenders are entitled to take steps--such as demanding extended discovery--that will delay such a decision past the end of the cure period. Just as the borrower has no right to prolong the contractual cure period in order to obtain an adjudication of the merits of the default notice, the lender has no right to engage in conduct that effectively shortens the period in which the borrower may cure or obtain such an adjudication.
 
 
 46
 In sum, when the district court is presented with a claim for adjudication of the merits of the default notice and/or a demand by the lender for discovery, it should not allow either party to take action that would unilaterally vary the contractual terms. In such circumstances, the court should, first, assess the need for the requested discovery. We can envision scenarios in which the lender would have no real need for discovery, as where the facts and events are stipulated and the only question is whether those events constitute a default within the meaning of the indenture, or where the notice of default has no plausible basis. In such instances, the district court may simply deny the discovery request.
 
 
 47
 Where discovery is warranted, the court should exercise its inherent power to limit and expedite it. In addition, the court may, in order to protect both the right of the lender to obtain admissible evidence of default and the right of the borrower to use the full cure period to secure an adjudication, stay the running of the cure period for such time as the lender needs for discovery. If it decides to stay the running of the cure period while the lender conducts discovery, the court should take such steps as may be appropriate and necessary to prevent dilatory discovery responses by the borrower.
 
 
 48
 In the present case, the district court declined to address RJR's contention that plaintiffs' notices of default were sent in bad faith. Though the negative pledge covenants speak in terms of "mortgag[ing]" and "pledg[ing]," and perhaps those terms will be interpreted strictly, it may be that plaintiffs will be able to persuade the court (a) that these covenants were intended to prohibit any transaction that would, as to certain property, in effect give new lenders priority over the holders of the debt securities, and (b) that an agreement to sell that property in order to repay new lenders does in effect grant the new lenders priority interests in those assets. "The negative pledge covenant is intended to prevent other creditors from obtaining priority over the debentureholders.... The possible encumbrances or claims which may create a priority over outstanding debentures or other such unsecured indebtedness may take a variety of forms." Commentaries at 350. Thus, while plaintiffs' claim that the LBO structure violated the negative pledge covenants may be novel, we doubt that the district court will determine that it has no plausible basis.
 
 CONCLUSION
 
 49
 We have considered all of RJR's arguments in support of the district court's injunction and have found them to be without merit. We vacate so much of the June 9 Order as tolled the running of the cure periods in the October 15, 1982 and April 1, 1977 indentures pending decision of the merits of the notices of default, and remand for further proceedings not inconsistent with this opinion. The stay provisions of the June 9 Order are vacated as of the date of the issuance of our mandate, and not ab initio. The mandate shall issue forthwith.
 
 
 50
 Costs to plaintiffs.
 
 
 51
 LEVAL, District Judge, dissenting.
 
 
 52
 I respectfully dissent. Judge Walker's grant of a preliminary injunction staying the cure period was fully justified under Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70 (2d Cir.1979), although I believe the stay should have been of more limited duration.
 
 
 53
 The first question on RJR's application for a preliminary injunction is whether the cure period provided by the indenture was susceptible to a court ordered stay. That question has three parts: (i) Whether the intention of the parties as expressed in the indentures supplies the answer; (ii) whether the laws of New York give guidance; and (iii) whether the familiar rule for the grant of preliminary injunctions in the federal courts is applicable. On each of these issues, I disagree with the majority's approach.
 
 
 54
 1. The ambiguity of the indentures. The majority opinion rules that the indentures unambiguously exclude a provisional stay. The theory is that because the indentures provide for cure periods of 60 and 90 days, they implicitly forbid any stay. When a contract provides for a cure period of a specified duration, any provisional stay, no matter how brief, alters the agreement and is therefore impermissible.
 
 
 55
 The argument has an appealing logic and in prior times would no doubt have evoked little disagreement. It fails, however, to take account of modern equity practice. In litigation today, provisional orders of restraint to preserve the status quo are commonplace. Temporary restraining orders, preliminary injunctions, and stays may delay the enforcement of contract rights. See cases cited on pp. 895-96 and 896 infra.[1] Sophisticated parties who enter into financing contracts know full well that if the relationship sours, and default, acceleration or foreclosure is threatened, application may be made to the court for a stay to preserve the status quo during litigation. Metropolitan Life Insurance Company, one of the nation's leading institutional lenders, and its attorneys were surely aware of this risk when it invested more than $300 million under the terms of the indentures.
 
 
 56
 In fact, the prospect of applications for stays is so familiar that the American Bar Foundation's Model Debenture Indenture Provisions and Commentaries includes a standard clause, captioned Waiver of Stay, which is expressly designed for lenders to obtain a covenant from the borrower that "it will not at any time ... plead, ... claim or take the benefit ... of, any stay...."[2] These lending institutions did not obtain such a Waiver of Stay in their indentures. Yet the majority opinion reads the indentures exactly as if they included this provision.[3]
 
 
 57
 One thing is clear: Wide ranging options were open to the contracting parties as to the availability of a stay. The indentures might have provided for an automatic stay of the cure period in the event of any litigation over a claim of default; the majority makes much of the fact that they did not so provide. Although the majority does not mention it, at the other extreme the indentures might also have included a borrower's waiver of the right to seek a stay. Or, in between, the parties might also have specified when, under what circumstances, and for what maximum duration the cure periods might have been tolled. As to all these different possibilities, the indentures are silent. Beyond specifying a 60 or 90 day cure period, they say absolutely nothing about whether or under what circumstances a court might grant an interlocutory stay tolling its expiration. The meaning of this silence is resoundingly unclear.
 
 
 58
 The ambiguity that arises from the silence of the contract is compounded by the fact that when the issue came to be decided at the start of the litigation, there had been neither discovery nor inquiry into the contractual negotiations capable of casting light on the meaning of the silence. Were there evidence from the negotiations of shared understandings as to the availability of a stay (such as an understanding that in the absence of language dictating otherwise, courts would be expected to follow the usual rules for the grant or denial of a preliminary injunction), surely such evidence would be admissible to aid the court in interpreting the meaning of an ambiguous term. But the absence of discovery, hearing or trial on those issues deprives the court of any opportunity to know whether helpful interpretive evidence exists.
 
 
 59
 Where I see silence and ambiguity as to whether a stay is permitted under these indentures, the majority sees a contract term that is "unambiguous on its face ...; 'a definite and precise meaning ... concerning which there is no reasonable basis for a difference of opinion.' " The recital of a 60-day cure period unambiguously demonstrates an intention to rule out any equitable stay. In fact, the majority finds the contract so unambiguous that extrinsic evidence would not even be admissible to affect its interpretation. No mention one way or the other of the tolling of cure periods plainly means no tolling of cure periods.
 
 
 60
 The majority's interpretation postulates a rule of interpretation that when a contract includes reference to a specified period of time for the taking of some action, the parties are deemed to have waived any right to seek a provisional equitable stay. No authority is cited for this rule of interpretation. To my mind, furthermore, it has no reasonable basis. Contracting parties who wish to exclude access to a provisional stay can easily put that in their contract. The conclusion that these indentures unambiguously exclude any provisional stay is unjustified.
 
 
 61
 2. New York law allows for such a stay. I disagree also with the majority's finding that a stay was "impermissible" under the law of New York.
 
 
 62
 The majority characterizes the district court's ruling as "[r]elying on landlord-tenant cases [First National Stores, Inc. v. Yellowstone, 21 N.Y.2d 630, 290 N.Y.S.2d 721, 237 N.E.2d 868 (1968) ], in which New York State courts had granted stays to tenants threatened with eviction by landlords claiming defaults...." The majority found that this reliance was error because the Yellowstone injunctions apply only to real estate leases, and there is no authority for extending Yellowstone to this circumstance.
 
 
 63
 As a preliminary matter, the majority mischaracterizes the district court opinion. Judge Walker did not rely on Yellowstone as a basis for his ruling. He relied on equitable circumstances which he evaluated under the Second Circuit's test governing the issuance of a preliminary injunction. See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d at 72; Video Trip Corp. v. Lightning Video, 866 F.2d 50, 52 (2d Cir.1989). It is true Judge Walker observed that his grant of a stay was "consistent with [the Yellowstone ] line of New York cases that tolls cure periods like those at issue under standards for equitable relief more relaxed than those just applied by the Court." He explicitly recognized, however, that the Yellowstone cases were limited to the landlord-tenant context, and that they involve a more lenient standard than the one he followed. In no sense did he regard the Yellowstone decisions as controlling.
 
 
 64
 I agree with the majority (and Judge Walker) that the Yellowstone principle does not govern here. Yellowstone is an exception to New York's normal preliminary injunction rule. Whereas the normal rule requires a showing of likelihood of success, irreparable harm and a balance of the equities before a court will award a preliminary injunction, Preferred Equities Corporation v. Ziegelman, 155 A.D.2d 424, 547 N.Y.S.2d 355 (2d Dept.1989); Grant Co. v. Srogi, 52 N.Y.2d 496, 438 N.Y.S.2d 761, 420 N.E.2d 953 (1981), the Yellowstone principle authorizes a stay of a tenant's cure period merely upon a showing that the tenant may suffer termination of the lease if the stay is not granted. Post v. 120 East End Ave., 62 N.Y.2d 19, 475 N.Y.S.2d 821, 823, 464 N.E.2d 125, 127 (1st Dept.1983).[4]
 
 
 65
 Although I agree that the Yellowstone cases are not controlling, the majority's insistence on their irrelevance is overstated. To be sure, there is no authority suggesting the New York courts would extend the diminished showing necessary under Yellowstone from leases to indentures governing debt. Judge Walker was surely justified, however, in noting the Yellowstone cases as a relevant indication of an openness in New York jurisprudence to stay cure periods to protect against irreparable harm. New York courts, furthermore, have in fact extended the Yellowstone doctrine beyond lease defaults to mortgage foreclosures--a context which is quite similar to ours. See 150 East 58th St. Assoc. v. Fletcher, 35 A.D.2d 947, 316 N.Y.S.2d 644 (1st Dept.1970).
 
 
 66
 But even if the majority opinion is correct that Yellowstone has no bearing whatever on these cure periods, nonetheless, it does not follow, as the majority opinion supposes, that a stay is "impermissible" under New York law. The majority cites no authority for this proposition. And New York law is to the contrary. The inapplicability of the special Yellowstone rule means only that the normal New York rule applies for the grant of an interlocutory stay or preliminary injunction. An applicant who shows irreparable harm, likelihood of success and a balance of equities is entitled to a preliminary injunction. Preferred Equities, 547 N.Y.S.2d, supra, at 356. "Preliminary injunctions and temporary restraining orders have been granted [by New York courts] in cases involving contract rights of all descriptions." 7A Weinstein, Korn & Miller, New York Civil Practice p 6301.29. It is not uncommon for such preliminary injunctions to bar temporarily the enforcement of explicit written contract rights pending litigation, including the stay of a cure period. See, e.g., 150 East 58th St. Assoc. v. Fletcher, 35 A.D.2d 947, 316 N.Y.S.2d 644 (1st Dept.1970) (tolling cure period for mortgage default); United States Ice Cream Corp. v. Carvel Corp., 136 A.D.2d 626, 523 N.Y.S.2d 869 (2d Dept.1988) (preliminarily enjoining exercise of explicit contractual right to terminate a franchise); Courageous Syndicate, Inc. v. People-to-People Sports Committee, Inc., 112 A.D.2d 916, 492 N.Y.S.2d 433 (2d Dept.1985) (defendant preliminarily enjoined from implementing contract provision for letting of yachts, pending litigation); Cut Corners v. Barterama, 83 A.D.2d 948, 442 N.Y.S.2d 790 (2d Dept.1981) (defendant preliminarily enjoined from exercising right to oust plaintiff from selling in defendant's flea market, pending trial of plaintiff's contention that oral modification permitted plaintiff to remain).
 
 
 67
 I find no basis in New York cases for the majority's conclusion that New York law opposes the provisional stay of a cure period under an indenture.
 
 
 68
 3. The federal preliminary injunction rule favors a stay. I turn finally to the availability of a stay under the familiar standards for a preliminary injunction in the Second Circuit, which I would consider the controlling inquiry in the absence of a clear answer provided by either the contract or New York law. In this circuit, a litigant is entitled to a preliminary injunction or stay on a showing of irreparable harm coupled with either likelihood of success on the merits or a combination of serious questions on the merits making a fair ground for litigation and a balance of hardships tipping decidedly in favor of the applicant. See Jackson Dairy, supra.
 
 
 69
 The majority makes assertions about the nature of preliminary injunctive relief which I believe are exaggerated. The opinion states that, "[i]n its efforts to preserve the parties' rights and the status quo, the court must be careful not to alter the terms of the agreement. 'The parties having agreed upon their own terms and conditions, "the courts cannot change them and must not permit them to be violated or disregarded." ' Diversified Mtge. Inv. v. U.S. Life Title Ins. of N.Y., 544 F.2d 571, 575 (2d Cir.1976), quoting Whiteside v. North American Accid. Ins. Co., 200 N.Y. 320, 326, 93 N.E. 948 (1911)." (Emphasis added.) The majority finds that the district court failed to "follow these prescriptions."
 
 
 70
 The prescriptions are overstated. It is in the nature of stays, TROs and preliminary injunctions that they can temporarily alter the terms of an agreement or suspend its operation, pending final adjudication.[5] Commonly in contract litigation, by reason of a finding of irreparable harm that would otherwise be suffered, the court bars a contracting party from taking an action which, but for the order, would be expressly permitted by a provision of the contract. Such orders are issued notwithstanding recognition that the party against whom the order is directed may ultimately prevail on the merits and may therefore be fully entitled, under the terms of the contract, to do what it is preliminarily stayed from doing. For example, while this appeal was sub judice, this court directed the entry of a preliminary injunction barring a party from exercising a contractually specified termination right in order to maintain the status quo pending full trial. Reuters Ltd. v. United Press International, Inc., 903 F.2d 904 (2d Cir.1990). And, in Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Distributors, 749 F.2d 124 (2d Cir.1984) (per curiam), this court provisionally barred the implementation of the contractually specified right to terminate a distributorship in order to preserve the status quo during arbitration. See also Unicon Management Corp. v. Koppers Co., 366 F.2d 199, 204 (2d Cir.1966) (plaintiff preliminarily enjoined from exercising its contractual right to manage defendant's office by reason of equitable factors, pending trial of defendant's claims of breach); Mississippi Power & Light v. United Gas Pipeline, 760 F.2d 618 (8th Cir.1985).
 
 
 71
 To be sure, in granting provisional relief courts should not lightly or excessively alter contractual commitments. The exacting rules governing preliminary injunctions are designed to insure that courts will do so sparingly and only when (and to the extent) well justified by irreparable harm and the balance of hardships. Had the majority asserted that in granting preliminary stays courts should not excessively or unreasonably interfere with negotiated contract rights, I would fully agree. But the opinion goes much further.
 
 
 72
 * * * * * *
 
 
 73
 Judge Walker followed this court's well established Jackson Dairy standard in deciding whether to issue a preliminary injunction. The circumstance that most powerfully motivated his decision was that the bondholders, after triggering the start of the cure period by serving notices of default, objected to a speedy adjudication schedule. They demanded four months to conduct discovery, but objected to a stay of the cure period during their discovery. Judge Walker concluded, with excellent justification, that the bondholders could not in fairness have it both ways. If the bondholders' position prevailed, their four months' discovery would extend beyond the cure period, with the result that the borrower would be required either to yield to a probably invalid notice and cure without opportunity for judicial vindication, or run the risk of adjudication of the validity of the default notice without opportunity to cure in the event the court's ruling were unfavorable. Judge Walker found this unreasonable. So do I. This supported his finding of irreparable harm;[6] also, in view of the bondholders' failure to make any showing of harm resulting from a stay of the cure period, it supported his finding of a balance of hardships in RJR's favor.
 
 
 74
 The district judge also correctly found that RJR's rejection of the bondholders' claim of default raised a fair ground for litigation. Although he stopped just short of ruling that RJR was likely to succeed on the merits in defeating the plaintiffs' imaginative theory of default, he did note that no other bondholders had seen fit to declare default under the same provisions.[7]
 
 
 75
 On the basis of the findings summarized above, Judge Walker was entirely justified in granting a preliminary injunction tolling the cure period. The majority opinion, in fact, appears to agree. It expressly states that when a lender demands discovery after serving a default notice, "the court may, in order to protect both the right of the lender to obtain admissible evidence of default and the right of the borrower to use the full cure period to secure an adjudication, stay the running of the cure period for such time as the lender needs for discovery."
 
 
 76
 On the appropriate duration of the stay, however, I respectfully disagree with some of the district judge's analysis. Judge Walker believed that unless a stay continued through adjudication of the merits of the claimed default, RJR would be deprived of its contractually guaranteed opportunity to cure. Accordingly, his order tolled the cure period through decision of RJR's suit for declaratory judgment of the invalidity of the default notices.
 
 
 77
 In my view, this ruling granted too long a stay and bypassed the opportunity for a final ruling on the disputed question whether the agreement of the parties permitted tolling of the cure periods. As I noted above, the indentures are silent and ambiguous on this question. I agree with the majority opinion that, because the preliminary injunction provided for no further ruling on whether a stay was contemplated by the terms of the indentures, it "determined with finality the matter of whether the cure periods ... may be expanded by order of the court." If the bondholders wished an opportunity to prove, after expedited discovery and trial of this issue, that no stay was permissible, they should have been entitled to it. They might conceivably have been able to present extrinsic evidence from the contract negotiations that would have shown that no tolling was intended. If this had been proved after expedited trial of that issue, the district court would then have terminated the stay and required the borrower to choose among its unpleasant options. If, on the other hand, the court had found after such trial that stay was contemplated under whatever conditions, it could then have continued the stay under terms consistent with the contractual understanding, including (if appropriate) a stay through eventual adjudication of the merits of the default notices.
 
 
 78
 Such a proceeding may be cumbersome.[8] It is, nonetheless, necessary to preserve the opportunity for both sides to demonstrate (with the benefit of discovery) that a stay was or was not contemplated in the agreement represented by the indentures. The district judge's resolution foreclosed the opportunity of the lenders. The majority's resolution forecloses that of the borrower.
 
 
 79
 * * * * * *
 
 
 80
 In conclusion, I would affirm the district court's grant of a preliminary injunction, but with a more limited duration. Initially the provisional stay should not, in my view, have extended through final trial on the merits, but only through prompt final trial of the ambiguous question whether the indentures allow for any stay of the cure periods. On the basis of that decision, the court would determine whether there is a contractual right to any further stay.[9]
 
 
 81
 Although arrived at by very different chains of reasoning, the majority's disposition and mine are not so far apart. Despite the implication in the majority opinion that the indentures bar RJR from seeking a stay of the cure period ("There is no mention in either indenture ... of a right on the part of RJR to seek an extension from the court"), the majority clearly rules it appropriate to stay the cure period during the lenders' discovery. The lenders had demanded four months' discovery. The record before us does not reflect whether any or all of this discovery has been accomplished, or whether the proceedings in the district court stopped during this appeal. Although the majority ruling vacates the stay instituted by the district judge, its remand for further proceedings "not inconsistent with this opinion," presumably allows for the entry of a more limited stay to last through the bondholders' discovery, if any remains to be done.
 
 
 
 *
 Honorable Pierre N. Leval, Judge of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 In fact, the recent trend of the law has been to make such stays more easily available. Whereas the prior rule in this circuit barred the issuance of a preliminary injunction without a showing of likelihood of success on the merits, the newer rule in effect in the last 15 years or so, requires that a litigant show only a fair question for litigation, so long as it is coupled with irreparable harm and a balance of hardships in favor of the applicant. Jackson Dairy, supra. Sonesta International Hotels v. Wellington Assoc., 483 F.2d 247 (2d Cir.1973); Triebwasser and Katz v. American Telephone & Telegraph Co., 535 F.2d 1356 (2d Cir.1976)
 
 
 [2]
 American Bar Foundation, Commentaries on Model Debenture Indenture Provisions 1965, Sec. 5-15 [Section 515] Waiver of Stay or Extension Laws. The commentary explains that "these provisions historically have developed from the similar provisions contained in mortgage indentures ... [and that] a great many contemporary debenture indentures contain such provisions...."
 
 
 [3]
 The majority opinion suggests that this clause concerns only stays arising under "statutory law" and is therefore irrelevant. I find this argument quite unconvincing. Grammarians could argue whether a covenant not to "plead ... any stay or extension law wherever enacted" addresses only enacted stays or includes non-statutory stays as well. As a matter of grammar, I cannot tell
 As a matter of contract interpretation, however, it would be bizarre for a lender to insist that the borrower waive the benefit only of those stays that are authorized by statute. A lender seeking a waiver of stay would have little interest in whether the stay had its origins in statutory or decisional law; it would wish a waiver of all stays. That is what the standard clause seems to me to involve.
 Whether a stay was statutory (and thus forbidden) or judicial (and therefore not covered by the waiver) might turn on whether the procedural law of the state where suit was brought had been codified. Because bond indentures characteristically relate to long-term debt that will be outstanding for decades, the parties to the indenture would not know at the time of the agreement whether in the future when suit is brought the stay procedure will derive from statutory or judge-made law.
 Furthermore, the majority's reading might make the availability of a stay turn on whether the lawsuit involved citizens of the same or different states, and was brought in state or federal court. In New York, the procedural law is codified; preliminary injunctions and temporary restraining orders are authorized by New York Civ.Prac.L. & R. Sec. 6301. Thus, for a suit brought in the New York state courts, a stay is a matter of statutory law. If the suit is brought in federal court, a stay is sought under Rule 65, F.R.Civ.P. Under the majority reading, the federal rule might not qualify as "enacted," making the provision inapplicable.
 The majority's interpretation of the Model Indenture provision as relating only to statutory stays thus seems to me to be quirky and incompatible with the interests of the parties to the indenture, who might rationally agree either to allow or to disallow stays, but not depending on whether they come from statutes.
 
 
 [4]
 The New York courts justify this attenuated requirement by the harshness of the default provisions in standard leases. Post, 475 N.Y.S.2d at 823, 464 N.E.2d at 127
 
 
 [5]
 The cases which the majority cites, in support of the proposition that preliminary injunctions may not alter contract terms, do not support it. The 1911 New York Court of Appeals decision which is quoted, Whiteside, was not a preliminary injunction case. An insured, suing to collect on a policy, asked the court to excuse his failure to have given the notice required by the policy. The court refused to cancel a contractual requirement and dismissed the action
 Although Diversified Mtge. Inv., supra, was a preliminary injunction case and quoted this proposition from Whiteside in vacating a preliminary injunction, it is clear on a close reading that Diversified does not adopt so drastic a rule. The preliminary injunction granted by District Judge Weinfeld was reversed not simply because it altered a contract provision. The Court of Appeals rather found that the plaintiff had shown "insufficient causally related irreparable injury," 544 F.2d at 577, and that the preliminary injunction harmed the defendant by permanently depriving it of significant contractual rights. 544 F.2d at 575. In that respect, Diversified differs from this case; here, according to Judge Walker's findings, denial of a stay would subject RJR to irreparable harm while grant of a stay would cause no harm to the lenders.
 
 
 [6]
 The potential harm to RJR is enormous, especially if its other borrowing instruments include common cross-default provisions which make a default on any borrowing constitute a default under other instruments. If such is the case, a ruling adverse to RJR after expiration of the cure period could place its entire debt structure in default
 
 
 [7]
 Although this conclusion is not necessary to the affirmance of the stay, in my opinion Judge Walker might well have found that RJR demonstrated a likelihood of success on the merits. The negative covenants are quite specific in their proscription. They bar RJR from granting a "mortgage or pledge [of any assets] as security for any indebtedness" without securing the bonds "equally and ratably." The arrangement which the bondholders contend violated this covenant was RJR's promise to pay certain debt, selling unspecified assets to the extent necessary to do so. This involved neither a mortgage, nor pledge, nor encumbrance, nor security interest of any kind. Unquestionably, this involved paying another debt before the bondholders', but that is not what the covenant appears to bar
 
 
 [8]
 It is, of course, likely that after discovery neither side would have any extrinsic evidence to present in aid of the interpretation of the ambiguous contract. In such case, no evidentiary hearing would be required
 
 
 [9]
 The majority's rebuttal characterizes this opinion as asserting that modern equity practice "routinely enjoins the effective dates of cure provisions" and "that a contractual provision specifying a cure period of 60 days sets only a minimum period subject to routine judicial extensions that could last for years."
 I hope my opinion makes clear that I do not hold any of the views attributed to me. I do observe that in litigation today, "provisional orders of restraint to preserve the status quo are commonplace." I do not think that observation is controversial.
 Far from suggesting that stays are, or should be, "routinely" granted, my opinion stresses the need for a strong showing of irreparable harm and balance of hardships to justify such an order, lest it interfere unduly with contractual commitments. The view that I advocate "routine judicial extensions lasting for years" ("calculated by the length of the chancellor's foot") is particularly puzzling in view of my conclusion that the stay granted below was too open-ended and should have lasted no longer than to allow for prompt trial of the amenability of the contract to any further stay.
 Finally the majority makes much of the argument that, because Judge Walker's tolling order provided no further opportunity to litigate the appropriateness of a stay prior to final resolution of the merits of the default notices, it was a permanent rather than a preliminary injunction. I do not disagree. But the remedy to correct the excessive duration of a stay is to shorten its duration--not to vacate it.