**THOMAS DE LA RUE AG, Plaintiff,**

v.

**UNITED STATES BANKNOTE CORPORATION,**
**Defendant.**

**No. 94 Civ. 7925(MGC).**

United States District Court,
S.D. New York.

Sept. 19, 1997.

Weil, Gotshal & Manges L.L.P., New York
City by Dennis J. Block, Richard L. Levine,
Suzanne J. Romajas, for Defendant.

*OPINION*

CEDARBAUM, District Judge.

This action arises out of United States
Banknote Corporation's purchase of Thomas
De La Rue Grafica é Servicos Limitada
("Grafica"), a Brazilian subsidiary of Thomas
De La Rue AG ("TDLR"). The transaction
is memorialized in a Stock Purchase Agree-
ment (the "Agreement") dated June 7, 1993,
between Banknote and TDLR. Pursuant to
the Agreement, Banknote paid $45 million to
TDLR for Grafica, of which $38 million was
in the form of cash and $7 million was in the
form of unregistered Banknote common
stock. In this action, TDLR sues Banknote
for: (1) breach of a warranty in the Agree-
ment stating that all documents filed with the
Securities and Exchange Commission
("SEC") since July 25, 1990, complied in all
material respects with the securities laws
and contained no material misstatements or
omissions; and (2) breach of a provision in
the Agreement requiring Banknote to regis-
ter the unregistered stock held by TDLR
with the SEC "as expeditiously as possible"
after receiving a written request from
TDLR.

TDLR has moved for summary judgment
on several grounds. At oral argument on
November 15, 1996, I granted TDLR's mo-
tion for partial summary judgment on its
first claim by ruling that TDLR is not re-
quired to prove scienter in order to prevail
on its breach of warranty claim. At oral
argument on June 13, 1997, TDLR withdrew
its formal motion concerning the proper cal-
culation of damages; that issue will be decid-
ed separately prior to trial. Accordingly, the
only outstanding issue is whether TDLR's
motion for summary judgment on the second
claim, which alleges failure timely to register
stock, should be granted. Because the ques-
tion of whether Banknote acted "as expedi-
tiously as possible" in registering the stock is
a question of fact for the jury, the motion is
denied.

Winthrop, Stimson, Putnam & Roberts,
New York City by David G. Keyko, Peter
D.C. Mason, Takemi Ueno, for Plaintiff.

*Undisputed Facts*

Negotiations between Banknote and TDLR for the sale of Grafica began in late 1992. Morris Weissman, Chairman and Chief Executive Officer of Banknote, was the principal negotiator on Banknote's behalf. John White, a director and senior executive of De La Rue plc., TDLR's ultimate corporate parent, was the principal negotiator on behalf of TDLR. During the course of the negotiations, Banknote informed TDLR that the purchase price of Grafica would have to include some form of non-cash consideration. Ultimately, it was agreed that the compensation would include approximately $38 million in cash and approximately $7 million in unregistered Banknote common stock.

On May 24, 1993, a draft of the Stock Purchase Agreement was prepared that incorporated a stock registration requirement. Section 9.1 of the draft provided that within fifteen days after a lock-up period, Banknote would file a registration statement for all of the Banknote shares owned by TDLR. In addition, Section 9.3 of the draft agreement provided that if and when Banknote was required to effect registration, Banknote would prepare and file the registration statement "as expeditiously as possible" and would thereafter use its "best efforts" to cause the registration statement to become effective.

Banknote objected to the fifteen-day limit in the May 24 draft. Accordingly, the final Stock Purchase Agreement, dated June 7, 1993, did not incorporate the fifteen-day limit and did not substitute any other specific time limit. The Agreement provided for a four-month lock-up period following the closing date during which TDLR could not sell its Banknote shares. At any time after the expiration of the lock-up period, TDLR could request in writing that Banknote register the shares. The Agreement retained the language that had been present in the May 24 draft providing that upon such request, Banknote would act "as expeditiously as possible" in filing the registration statement and would use its "best efforts" to cause the registration statement to be declared effective by the SEC.

The closing took place on June 23, 1993. During the subsequent four-month lock-up period, Banknote began to prepare the registration statement. The lock-up period ended on October 21, 1993, and on October 22, 1993, Banknote received a written request for registration from TDLR pursuant to the Agreement. By letter dated October 25, 1993, Harvey Kesner, Vice President and General Counsel of Banknote, acknowledged receipt of the request and stated that Banknote "has commenced taking the steps necessary to accomplish registration and intends to file within approximately 30 days." (Exh. 33 to Ueno Decl.) However, the registration statement was not filed until April 24, 1994, nearly six months after TDLR's written request for registration. The six-month delay in the filing of the registration statement was the result of two separate corporate events: first, the potential acquisition of a company called Video Lottery Technologies ("VLT") in late 1993 and early 1994, and second, a debt restructuring in early 1994.

Preliminary discussions concerning the possible acquisition of VLT commenced in August 1993. On October 15, 1993, Banknote entered into a confidentiality agreement with VLT, dated as of August 17, 1993. It provided that Banknote would not disclose the potential acquisition of VLT unless "advised by [its] outside counsel that disclosure must be made [] in order that [Banknote] not commit a violation of law ...." On November 23, 1993, Banknote submitted a formal acquisition proposal to VLT. On or about December 1, 1993, Banknote determined in consultation with counsel that the contemplated transaction between Banknote and VLT would have to be disclosed in any registration statement filed with the SEC. Banknote contends that such disclosure was precluded by the terms of its confidentiality agreement with VLT and would have jeopardized the negotiations with VLT. (Def.'s 3(g) ¶¶ 33, 34.) On January 21, 1994, however, VLT rejected Banknote's acquisition offer and accepted an offer from a competing bidder.

Banknote contends that following VLT's rejection of its offer, it promptly resumed preparation of the registration statement. (Def.'s 3(g) ¶ 44; Pl.'s Resp. to Def.'s 3(g) ¶ 44.) In early February, 1994, however, Banknote again suspended its registration

efforts.[1] According to Banknote, it could not file a registration statement until it had filed its 1993 Form 10–K with audited financial statements through the end of 1993. Banknote argues that any registration statement filed before the 1993 Form 10–K would be incomplete and misleading because that 10–K was the first to contain audited financial statements for its new Brazilian subsidiary. In addition, Banknote was involved in a debt restructuring which would have to be disclosed in any registration statement. (Def.'s 3(g) ¶ 48.) Banknote contends that those circumstances permitted it to delay filing a registration statement. Ultimately, the registration statement was not filed until April 24, 1994. It was declared effective by the SEC on August 10, 1994.

The six-month time period between TDLR's request for registration and Banknote's filing of the registration statement covered a period during which the price of Banknote common stock fell dramatically. A large part of the decline occurred on January 6, 1994, following Banknote's announcement that it had not been awarded any new postage stamp printing contracts by the Postal Service under a competitive bidding process known as the Multi–Print Solicitation. On that date, the market price of Banknote common stock declined from $6 1/8 to $4 3/8. By August 10, 1994, the date on which the SEC declared the registration statement effective, the closing price of Banknote common stock was $2 7/8 per share. In this action, TDLR sues Banknote for the damages it incurred due to its inability to sell the Banknote stock prior to the decline in the stock price.

## Discussion

In this motion for partial summary judgment, TDLR seeks a determination as a matter of law that Banknote breached the provision of the Agreement requiring Banknote to register the stock "as expeditiously as possible" following TDLR's written request for registration. TDLR does not, however, seek a determination of the date on which the breach occurred or the date on which the stock would have been registered in the ab-

sence of a breach; TDLR contends that those are issues of fact for the jury. Banknote, in its opposition to the motion, argues that the language requiring it to act "as expeditiously as possible" is ambiguous and that summary judgment is therefore inappropriate.

Under New York law, the question of whether the language of a contract is ambiguous is a question of law for the court. *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 429 (2d Cir.1992). Ambiguous language is that which is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* at 428 (quoting *Walk–In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987)). If a contract is ambiguous, summary judgment is generally inappropriate because the non-moving party has a right to present extrinsic evidence regarding the meaning of the contested terms. *Wards Co., Inc. v. Stamford Ridgeway Associates*, 761 F.2d 117, 120 (2d Cir.1985).

On the other hand, contractual language that has a "definite and precise meaning" concerning which there is "no reasonable basis for a difference in opinion" is not ambiguous. *Seiden Associates*, 959 F.2d at 428 (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)). If a contract is unambiguous on its face, the parties' rights under that contract "should be fathomed from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable." *Metropolitan Life Insurance Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990).

The phrase "as expeditiously as possible" does not appear to be a term of art or a commonly used term in the context of stock registration provisions.[2] "Expeditiously"

---

**1.** TDLR argues that there is no evidence that Banknote ever resumed its registration efforts. It is unnecessary to resolve that issue at this time.

**2.** The parties cite one case, *Wulfing v. Kansas City Southern Industries, Inc.*, 842 S.W.2d 133 (Mo.Ct.App.1992), in which the phrase "as expeditiously as possible" was used in the context of a

connotes "promptly" and "efficiently" in ordinary usage, and the parties do not argue that it means something different in this context. The parties' real dispute is over the effect of the words "as possible." TDLR argues that the phrase "as expeditiously as possible" requires Banknote to act immediately and allows Banknote to delay registration only if circumstances make it literally impossible to file a registration statement. That is, TDLR contends that the words "as possible" invoke the legal doctrine of impossibility. Banknote, on the other hand, argues that the requirement that it act "as expeditiously as possible" imposes an obligation to file the registration statement "as soon as possible, consistent with (and without jeopardizing) Banknote's pursuit of its other legitimate corporate obligations and opportunities, as well as under circumstances permitting the filing to be made with a realistic likelihood that the registration statement would be cleared by the SEC." (Def.'s Mem. in Opp'n at 9–10, 17.)

■■■■ The fact that parties urge differing interpretations of a contract provision, however, does not render that provision ambiguous. *Seiden Associates*, 959 F.2d at 428. If a party urges an interpretation that "strain[s] the contract language beyond its reasonable and ordinary meaning," the court may not, on that basis, find an ambiguity. *Id.* (citing *Bethlehem Steel Co. v. Turner Construction Co.*, 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 93, 141 N.E.2d 590, 593–92 (1957)). In this case, the contract provision does not appear on its face to be ambiguous. The most straightforward and reasonable interpretation of the provision is that Banknote was required to file the registration statement as promptly and efficiently as was reasonably possible under the circumstances.

■■■■ TDLR's contention that the provision invokes the doctrine of impossibility under New York law is unpersuasive and "strains the contract' language beyond its reasonable and ordinary meaning." In the

first place, if the parties had intended to incorporate the legal doctrine of impossibility, it would have been unnecessary to include the words "as possible" in the contract since the law of New York recognizes the defense of impossibility in any event. *See generally Kel Kim Corp. v. Central Markets, Inc.*, 70 N.Y.2d 900, 524 N.Y.S.2d 384, 519 N.E.2d 295 (1987). Moreover, in .other contexts courts have interpreted the words "as possible" to incorporate the concept of reasonableness under all the circumstances. *See, e.g., Myers v. Cigna Property and Casualty Insurance Co.*, 953 F.Supp. 551 (S.D.N.Y.1997) (provision in insurance contract requiring insured to notify insurer "as soon as possible"); *see also Jenkins v. Burgos*, 99 A.D.2d 217, 472 N.Y.S.2d 373 (1st Dep't 1984) (insurance context). Finally, in ordinary usage phrases like "as soon as possible" or "as expeditiously as possible" are understood to mean "as soon as reasonably possible under all the circumstances." Accordingly, the registration provision is not ambiguous; it imposes an obligation on Banknote to act as expeditiously as reasonably possible under the circumstances.

Although the registration provision is not ambiguous, and therefore consideration of extrinsic evidence concerning the parties' intent or the negotiation process is impermissible, summary judgment is inappropriate in this case. There is a genuine issue of material fact as to whether Banknote acted as expeditiously as reasonably possible under the circumstances. It is for the jury to decide whether the delay in registration during Banknote's negotiations with VLT was a breach of Banknote's obligation under the contract. Negotiations concerning VLT began before TDLR's written request for registration, and there is an issue of fact as to whether disclosure of those negotiations would have impaired the negotiations or harmed Banknote in some way. Similarly, if Banknote can show that filing the registration statement with the SEC before filing the 1993 10–K would have been futile, the jury

stock registration provision. In that case, the court upheld the district court's refusal to instruct the jury that "as expeditiously as possible" meant "a reasonable time to complete what defendant agreed to do in good faith." *Id.* at 156. The court held that the phrase "is one of common usage and generally understood" and there-

fore "requires no definition." *Id.* at 157. Although it is not entirely clear from the opinion, the court appears to have agreed with or adopted the view of the attorney responsible for registration that "as expeditiously as possible" meant "as quickly as we reasonably could under the circumstances." *Id.*

may find that Banknote acted as expeditiously as possible under the circumstances. It is a closer question whether Banknote's suspension of its registration efforts during the debt restructuring was permitted by the contract. The restructuring did not commence until several months after TDLR's written request for registration, and it is not entirely clear why the restructuring could not have been disclosed on a registration statement. However, the delay was not so clearly impermissible that summary judgment is warranted. Accordingly, at trial the parties may introduce evidence concerning these circumstances insofar as such evidence relates to whether Banknote complied with its obligation under Section 9.3 of the Agreement to file a registration statement as expeditiously as possible.

Banknote makes the further argument that pursuant to the registration provision, it had the contractual right to suspend its registration efforts upon the occurrence of any material corporate event covered by Section 9.3(g) of the Agreement. Section 9.3(g) provides that, after registration, the occurrence of certain corporate events triggers an obligation on the part of TDLR to discontinue sale of the stock. Section 9.3(g) does not apply to the time period before the stock was registered, however. Thus, despite Banknote's argument to the contrary, whether a corporate event was of the type contemplated by Section 9.3(g) is irrelevant to the factfinder's determination of whether Banknote's delay in its filing of the registration statement was contractually permissible.

### Conclusion

For the foregoing reasons, defendant's motion for summary judgment is denied.

SO ORDERED.