**AIR SUPPORT INTERNATIONAL, INC., Plaintiff,**

v.

**ATLAS AIR, INC., Defendant.**

No. 98 CV 1078.

United States District Court,
E.D. New York.

June 15, 1999.

Mary Flynn, for plaintiff.

Robert Marrow, Salon, Marrow & Dickman, LLP, New York City, for defendant.

## Opinion and Order

GERSHON, District Judge.

Plaintiff Air Support International Inc. ("Air Support") brings this action for breach of contract against defendant Atlas Air Inc. ("Atlas") under this Court's diversity of citizenship jurisdiction. Air Support seeks commissions on leases it allegedly

procured for Atlas while acting as Atlas's broker. Discovery has been completed. Atlas now seeks summary judgment dismissing Air Support's First, Second, Eighth and Ninth claims. After oral argument, the parties advised the Court that plaintiff would withdraw its Ninth claim and that defendant would similarly withdraw its related First Counterclaim. Air Support seeks summary judgment granting its First, Fourth and Sixth claims.

## FACTS

Unless otherwise indicated, the following facts are undisputed.

### A. The Parties

Defendant Atlas is a Delaware corporation with its principal place of business in Colorado. Atlas is a public company doing business in New York. Atlas was organized in 1992 and began operations upon Federal Aviation Administration certification in February 1993. It operates Boeing 747 cargo aircraft worldwide.

Atlas does not operate its own scheduled service. Rather, Atlas leases out its aircraft and crew to other airlines which need additional cargo capacity, but which choose not to undertake the investment of acquiring additional aircraft and crew. These leases are called ACMI or "wet" leases; "ACMI" stands for aircraft, crew, maintenance and insurance, which are the four elements Atlas provides in a wet lease. The customer airline provides route authority, traffic rights, landing rights, cargo and rental payments. Atlas and the customer agree on a flight schedule and a required minimum monthly number of flight hours.

Plaintiff Air Support is a New York corporation organized in 1989, which began operations in 1994. Air Support's principal place of business is in New York. Its sole shareholder and full-time employee is Carsten Petersen ("Petersen"), a Danish citizen. Air Support's business is to broker wet leases and charters between airlines and wet lease operators such as At-las. While working for another company in 1993, Petersen met the principals of Atlas at JFK International Airport.

### B. The First Contract

On September 8, 1994, Atlas and Air Support entered into an agreement (the "First Contract"). The First Contract was in the form of a letter from David M. McElroy, then the Chief Operating Officer of Atlas, to Carsten Petersen, the President of Air Support. The First Contract, signed by both parties and with a handwritten date of September 8, 1994, provided in pertinent part that:

This letter will confirm our agreement whereby you will seek to obtain charter contracts, leases or cargo loads for Atlas Air, Inc.

1. You will solicit business in the following geographical areas: South America, Central America, Europe (except KLM, Air France, Lufthansa, Cargolux, British Airways), Middle East (except Saudia, Emirates)....

4. Atlas will pay you a commission on any contract with a new carrier where you have previously secured the business equal to 3% of the actual net proceeds, payable within 10 days of receipt of payment from the contracting party. You should clear prospective clients with Mr. McElroy or Mr. Chowdry, to avoid parties Atlas has previously contacted. Commissions on contract renewals from your clients will be mutually agreed upon.

5. This agreement may be terminated by either party on 30 days advance written notice....

7. You are an agent of Atlas in connection with any transaction accepted hereunder....

8. This Agreement will be governed by the laws of the State of New York, USA, and any litigation related hereto must be conducted before the courts of that state to whose jurisdiction you hereby consent.

9. This is the full and complete contract between the parties, and no other written or oral understandings are effective. This agreement cannot be amended orally or by course of dealing, but only by a written agreement signed by both parties.

On May 3, 1995, Atlas notified Air Support that it would be terminating the First Contract with Air Support on June 2, 1995, pursuant to the First Contract's 30–day notice provision.

*The SAS Lease*

The facts preceding the signing of the wet lease between Scandinavian Airline Systems ("SAS") and Atlas are undisputed. On November 16, 1993, Air Support's Petersen supplied a written analysis to Atlas regarding eastbound cargo routes from the United States to the Far East through Scandinavia. On November 18, 1993, Petersen wrote to Atlas that SAS was closing its Copenhagen–Los Angeles route and reducing its Scandinavia–New York service by fifty percent, thereby intensifying the demand for cargo service over these routes.

In March 1994, Petersen contacted SAS headquarters in Sweden on behalf of Atlas. Petersen also contacted Henric Nauckoff, SAS Director of Cargo Sales and Services in North America. On March 9, 1994, Petersen submitted a report to Atlas in which Petersen analyzed various scenarios under which Atlas could possibly do business with SAS, including a standard ACMI or wet lease, charters, or a joint venture between Atlas and SAS since it appeared that SAS desired some degree of risk-sharing, that is, that Atlas would bear part of the cost should SAS's planes end up not being fully loaded.

On March 10, 1994, Atlas's McElroy sent SAS an introductory letter proposing a straight (*i.e.,* no risk-sharing) agreement between SAS and Atlas, to start in April 1994, under which SAS would pay Atlas $6,000 per block hour. The letter also stated that "Atlas will consider a reduce [sic] rate during marketing development period and/or a joint venture proposal for the route."

On April 22, 1994, SAS employee Einar Longva wrote a letter to Atlas's Vice–President of Operations, James T. Matheny, in which he referenced a trip to Europe which Matheny had taken to meet with SAS. Petersen had arranged the trip and attended the meeting in question. In his letter to Matheny, on which Petersen was copied, Longva stated that "we would, at this time, based on a cooperation formula which at a later stage could develop into a firm long term wet lease agreement on traditional terms and conditions, like to propose" a risk-sharing lease agreement.

On May 6, 1994, Atlas's Matheny prepared a draft of a response to Longva's proposal, which Matheny first sent to Petersen for comments. In the final version of this letter, dated May 6, 1994, Atlas made a modified risk-sharing proposal to SAS, stating "Atlas is certainly willing to share the risk of developing this routing." On May 26, 1994, SAS responded to Matheny's risk-sharing proposal of May 6, 1994, with a counter-proposal in which Atlas would bear more of the risk. On that same day, Matheny responded to SAS's counter-proposal with a letter stating that "we will study your proposal carefully and provide a response in the very near future. I am confident that we can come to agreement on terms which will be acceptable to both airlines and result in a profitable venture for this freighter route. We look forward to finalizing an agreement soon."

There are no communications in the record between SAS and Atlas from May to October 1994. On November 7, 1994, Petersen sent SAS route information regarding distances between New York, Stockholm, Tokyo and Hong Kong. On November 8, 1994, Petersen sent a letter to executives Michael Chowdry, John Blue and David McElroy of Atlas, which stated that:

The new Director of cargo [of SAS], Mr. Jarl Frithiof has been very receptive

towards the idea of operating a weekly B747F flight from New York via Copenhagen or Stockholm to Tokyo.... I am currently in contact with both Mr. Frithiof as well as SAS's head office in Stockholm. SAS, being a typical passenger carrier, has traditionally never been cargo oriented. I therefore expect this negotiation to be rather lengthy. As you are aware, our initial negotiations started almost one year ago, and the progress was very slow, eventually resulting in SAS declining our offer.... I kindly ask you to be patient with any actual commitment from this potential customer, but I do feel that this business opportunity should be explored once more.

On November 9, 1994, Petersen wrote to SAS with a proposal for SAS to wet-lease "a Boeing 747–200F, once weekly from New York via Gothenburg to Japan." Drafts of proposals were then exchanged between Atlas and SAS. On January 16, 1995, David McElroy of Atlas sent a letter to SAS summarizing the proposed terms for the "start-up phase of your service." These terms included some risk-sharing. On January 30, 1995, Air Support's Petersen sent Atlas a memo which stated that "according to my [Petersen's] sources, Atlas Air, Inc. will get the contract."

On April 3, 1995, without notifying Air Support, Atlas's Matheny sent SAS a letter stating:

As follow up to our most recent discussions concerning freighter service for SAS, we have tried hard to procure additional aircraft, but without success. Currently, the aircraft we are adding to our fleet are committed to long term, full utilization contracts.

Regrettably, Atlas will not have aircraft availability with which to provide service to SAS until at least this fall.

We remain very interested in developing a service with your fine Airlines, and we hope to continue our contact until such time as we can provide the aircraft availability you need.

Thank you for your interest and consideration of Atlas.

On April 4, 1995, Air Support wrote to an aircraft brokerage company named JM Associates, Inc. ("JM") proposing that JM and Air Support offer a different aircraft to SAS for a twenty-four month lease. Air Support stated in the letter that "our competition has quoted SAS a[sic] ACMI rate of USD 6,000 per block hour." JM offered Air Support an aircraft which would satisfy SAS's requirements. Petersen then contacted SAS and offered SAS the aircraft offered by JM. Air Support stated in its letter to SAS that it "could offer a similar price to what SAS has negotiated with Atlas Air." Air Support was Atlas's agent at this time.

On May 3, 1995, Atlas sent Air Support a 30–day notice which terminated the First Contract on June 2, 1995. In the fall of 1995, Atlas employee Johannes Einarsson contacted SAS about signing a wet lease. Einarsson stated in a declaration dated January 20, 1999, signed under penalty of perjury, that he "procured the wet lease between Atlas and SAS dated December 4, 1995," and that he "negotiated the terms of the wet lease between Atlas and SAS over the telephone over the course of several weeks." Einarsson also stated that "no one from SAS ever mentioned Carsten Petersen or Air Support International in my presence, and I was unaware of any dealings between either of them and SAS on behalf of Atlas." Atlas employee George Murnane signed the SAS wet lease on December 4, 1995.

On December 4, 1995, six months after the termination of Air Support's First Contract with Atlas, Atlas and SAS entered into a straight (*i.e.*, no risk-sharing) wet lease agreement for a three-year term beginning March 1, 1996. The December 4, 1995 SAS lease was on terms different from the January 16, 1995 draft lease proposed by Air Support: The routing was different; the final lease was for three years rather than just one year; the mini-

mum guaranteed hours were different; the aircraft to be used were different; the rate did not depend on how loaded the aircraft was, in contrast to the draft proposal which contained risk-sharing; and there was no right to cancel except upon default in the final lease, in contrast to the draft proposal which contained a right to cancel upon 90 days' notice.

## C. The Second Contract

On February 6, 1996, Atlas and Air Support signed a new brokerage agreement (the "Second Contract"). The Second Contract provided in pertinent part:

> This Agreement is effective for one year beginning November 1, 1995 and ending October 31, 1996. This agreement supersedes any and all previous Agreements between the Parties. Atlas Air and ASI hereby agree:
>
> 1. Atlas Air has retained ASI to be its agent with respect to aircraft wet leases with VARIG.
>
> 2. The Atlas Air VARIG wet lease agreement has been extended for a period of one year with the assistance of ASI.
>
> 3. In consideration of its assistance in successfully negotiating the contract, and providing support services during the term of the contract, including but not limited to assistance with remittances from Varig to Atlas Air and the promotion of goodwill, Atlas will pay to ASI a fee of $128 for every block hour that VARIG pays Atlas Air under the term of the contract.
>
> 4. Atlas also appoints Air Support as its exclusive agent with respect to any wet leases to be entered into with a Chilean air carrier at a rate of $100 per block hour.
>
> 5. Atlas Air shall pay to ASI within 5 days after the end of each month based upon the net proceeds received from VARIG or a Chilean carrier during each month and the rates set forth herein. . . .

> 8. ASI is an agent of Atlas in connection with any transaction accepted hereunder. . . .
>
> 9. This Agreement will be governed by the laws of the State of New York, USA. . . .
>
> 10. This is the full and complete contract between the parties, and no other written or oral understandings are effective. This agreement cannot be amended orally, but only by a written agreement signed by both parties.

### 1. *The Fast Air Lease*

During the term of the Second Contract, Air Support procured for Atlas an aircraft wet lease with Fast Air Carrier, a Chilean carrier. Atlas paid commissions to Air Support for the Fast Air lease until October 31, 1996—the date the Second Contract terminated—although the lease itself ran until December 31, 1997. Air Support now seeks to recover commissions incurred during the remaining term of the Fast Air lease. Atlas's David McElroy testified on the issue of commissions due Air Support for the whole term of the Fast Air lease in his deposition: "Q. Is it your understanding, not asking for a legal conclusion, but your business understanding that A.S.I. [Air Support] would be entitled to commissions through December 31st, 1997? A. Yes."

### 2. *The Arrangement With Aerofloral*

Fast Air had a working relationship with a Columbian company named Aerofloral. Aerofloral is not an airline, but is akin to a freight forwarder for flowers from Columbia which are destined for the United States. As a freight forwarder, Aerofloral cannot enter into wet leases.

When Air Support first approached Fast Air about signing a wet lease with Atlas in 1996, Fast Air was reluctant to commit to full utilization of an aircraft and considered using Aerofloral to help fill the aircraft. Fast Air and Aerofloral did not ultimately share the Atlas aircraft leased to Fast Air. Atlas leased an aircraft to Lineas Areas

Suramericanas ("LAS") which transported Aerofloral cargo. Atlas entered into the LAS lease after the expiration of the Second Contract. LAS is not a Chilean carrier. Atlas never promised Air Support a commission based upon aircraft utilization by the Colombian freight forwarder, Aerofloral or by LAS.

### 3. *The Varig Lease*

While operating under the First Contract, Air Support procured a wet lease for Atlas with Varig Brazilian Airlines ("Varig"), a Brazilian air carrier, which was signed by both parties on June 13, 1994. The June 13, 1994 lease bore the caption "Aircraft Charter Agreement No. 94–03–10." The initial contract period of the Atlas–Varig lease signed on June 13, 1994 was "from November 1, 1994 through February 28, 1995, renewable until November 30, 1995, under mutually agreeable terms and conditions with 45 days prior notification." The Varig lease was renewed prior to February 28, 1995, and renewed again on November 1, 1995 for a one-year period ending October 31, 1996.

Plaintiff Air Support claims that the Varig lease was then renewed again on October 31, 1996, when Atlas signed a contract entitled "Amendment No. 5–2 to Varig Aircraft Charter Agreement No. 94–03–10 for Reinstatement and Extension" (the "October 31, 1996 Lease"). Defendant Atlas contends that this document constituted a new lease, on different terms, and was therefore not covered by the Second Contract.

The language in the Second Contract regarding commission payments to be made to Air Support with respect to the VARIG lease includes that: "Atlas Air has retained ASI to be its agent with respect to aircraft wet leases with VARIG. . . . In consideration for its assistance in successfully negotiating the contract, and providing support services during the term of the contract. . . . Atlas will pay to ASI a fee of $128 for every block hour that VARIG pays Atlas Air under the term of the con-

tract." The dates of the Second Contract match the dates of the VARIG lease then in effect, but the Second Contract also states that Air Support is appointed Atlas's agent for all "leases," in plural form, with Varig.

Atlas has offered the following evidence that Air Support was not the procuring cause of the October 31, 1996 Lease with Varig, and Air Support has not disputed this evidence:

During the term of the Second Contract, Varig was in default on its payments on several occasions. Atlas sought Air Support's assistance in obtaining Varig's full compliance with the Second Contract. Air Support's primary contact at Varig's headquarters, Andreas Lauterstajn, was no longer working for Varig, however, and Air Support has presented no evidence of any efforts on its part to obtain Varig's compliance. Atlas's General Counsel, Clark Onstad, stated at his deposition that Atlas was trying to obtain Varig's agreement to a new lease to begin on November 1, 1996. Onstad stated that Atlas was having "great difficulty" in obtaining Varig's agreement to the October 31, 1996 Lease, and that Air Support's Petersen was no longer of any use to Atlas because he no longer had connections at Varig. Onstad further stated that in October 1996, he asked Air Support's Petersen to go to Dubai to meet with Varig employees and get the deal signed, but that Petersen did not go. Instead, Atlas employees went to Dubai and met with Varig employees.

The lease signed on October 31, 1996, was on terms different from the prior lease, including a lower minimum flight hour requirement. The parties dispute the degree and significance of the differences in terms between the two leases.

## DISCUSSION

### I. The Applicable Legal Standards

#### A. The Standard for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be

granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party must demonstrate the absence of any material factual issue genuinely in dispute. *See id.* A material fact is one whose resolution would "affect the outcome of the suit under governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986). The party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

### B. Governing Substantive Law

In this diversity action, state substantive law applies. *Aviation Development Co. v. C & S Acquisition Corp.,* 1999 WL 46630 (S.D.N.Y.1999) (citation omitted). The parties here expressly contracted and continue to agree that New York law will govern this dispute. "Where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry." *Texaco A/S (Denmark) v. Commercial Insurance Co. of Newark, NJ,* 160 F.3d 124 (2d Cir.1998) (citations omitted). New York law will therefore govern this case.

### C. Breach of Contract

■ The essential elements of an action for breach of contract under New York law are: (1) formation of a contract; (2) plaintiff's performance; (3) defendant's failure to perform; and (4) resulting damages to the plaintiff. *See Coastal Aviation, Inc. v. Commander Aircraft Co.,* 937 F.Supp. 1051, 1060 (S.D.N.Y.1996), *aff'd* 108 F.3d 1369 (2d Cir.1997). To prevail on a claim for breach of contract, a plaintiff must establish the existence of an enforceable contract at the time of the alleged breach. Under New York law, every contract contains an implied covenant of good faith and fair dealing. *See Frutico v. Bankers Trust Co.,* 833 F.Supp. 288, 300 (S.D.N.Y.1993).

■ "Under New York law, the initial interpretation of a contract is a matter of law for the court to decide. Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." *Alexander & Alexander Services, Inc. v. These Certain Underwriters at Lloyd's,* 136 F.3d 82, 86 (2d Cir.1998) (citations and quotations omitted). Furthermore, under New York law, "if a contract is unambiguous on its face, its proper construction is a question of law." *Metropolitan Life Insurance Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir.1990) (citations omitted).

■ "Contract language is not ambiguous if it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." *Id.* "Conversely, a contract is ambiguous if it is susceptible to more than one meaning." *Id.* "An 'ambiguous' word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *SeeWalk–In Med Centers, Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987). "Language whose meaning

is otherwise plain in not ambiguous merely because the parties urge different interpretations in the litigation." *See Metropolitan Life Insurance Co.*, 906 F.2d at 889. If the contract is deemed ambiguous by the court, "the court should afford the parties an opportunity to adduce extrinsic evidence as to their intent." *See Uniroyal v. Home Insurance Co.*, 707 F.Supp. 1368; 1374 (E.D.N.Y.1988).

## II. Analysis of the Parties' Claims

### A. The SAS Claims

Defendant seeks summary judgment dismissing plaintiff's First and Second Claims for commissions on the lease signed between Atlas and SAS. Preliminarily, defendant Atlas argues that a variety of defenses prevent this Court from reaching the merits of this action. As will be seen, these defenses are meritless.

#### 1. *Defenses*

##### a. Waiver

■ Defendant Atlas contends that Air Support "waived" its claim for SAS commissions by entering into the Second Contract in February 1996 without raising its SAS claims at that time. Waivers, however, cannot be inferred. A waiver is an "intentional relinquishment of a known right and should not be lightly presumed." *Gilbert Frank Corporation v. Federal Insurance Co.*, 70 N.Y.2d 966, 525 N.Y.S.2d 793, 520 N.E.2d 512 (1988). Absent an express statement by Air Support, such as a written release, that it intended to waive its rights to any claims with respect to the SAS lease, Air Support cannot be deemed to have waived its rights to make those claims.

##### b. Estoppel

■■ Atlas also claims that Air Support is "estopped" from bringing claims for SAS commissions because Atlas "relied" on Air Support's not bringing these claims when it entered into the Second Contract with Air Support. To be estopped, however, a party must engage in conduct which amounts to a false representation or concealment of material facts or which gives rise to the impression that the facts are otherwise than as asserted. *Deutsch v. Health Ins. Plan of Greater New York*, 573 F.Supp. 1433 (S.D.N.Y.1983) (quotations and citations omitted). There is no evidence that Air Support induced Atlas to enter into the Second Contract by misrepresenting any facts. There is no evidence that either party even mentioned any potential claims Air Support might have for SAS commissions. Nor was there any obligation to do so. Therefore, Air Support is not estopped from bringing those claims now.

##### c. Statute of Frauds

Defendant's statute of frauds defense is not applicable here because Air Support's claim for SAS commissions is based on the allegation that Air Support procured the lease during the term of the First Contract, which is a written agreement.

##### d. Superseding Language

■ Defendant Atlas's argument that the language in the Second Contract that it "supersedes any and all previous Agreements between the parties" somehow extinguishes legal claims which arose out of the language of the First Contract while it was in effect is without merit. Although the Second Contract superseded any other existing *agreements* between the parties, absent an express release provision in the Second Contract, Air Support has not waived, released or relinquished any *legal claims* which arose out of prior agreements.

#### 2. *The Merits*

Turning to the merits, defendant argues that Air Support has no right to commissions on a lease signed after the term of its brokerage agreement and for which it was not the procuring cause. Plaintiff seeks summary judgment granting its First

Claim for commissions from the Atlas–SAS lease on the ground that it was the procuring cause of the lease, even though the lease was signed after the brokerage contract was terminated. For the following reasons, summary judgment is granted to the defendant on both the First and Second Claims.

"To be entitled to a ... commission, a broker must show that he brought the parties together at mutually acceptable terms within the period of his employment." *Bashant v. Spinella*, 67 A.D.2d 1100, 415 N.Y.S.2d 146 (4th Dep't 1979). "In the absence of fraud or bad faith on the part of the sellers, the broker is not entitled to a commission on a sale negotiated after the term of his employment, even though the sale is negotiated with a buyer introduced to the seller by the broker." *Id.* See also *Agawam Realty Ltd. v. Haggerty*, 223 A.D.2d 518, 520, 636 N.Y.S.2d 379 (2d Dep't 1996) ("it is axiomatic that to recover real estate brokerage fees stemming from an unclosed transaction, the plaintiff 'must establish that he or she has procured a prospect who has reached agreement with the seller on essential terms and is ready, willing and able to perform' ") (citation omitted).

Plaintiff's reliance on *Buck v. Cimino*, 243 A.D.2d 681, 684, 663 N.Y.S.2d 635 (2d Dep't 1997), is misplaced. In *Buck*, the court said that "if the broker did not participate in any of the negotiations, he must at least show that he created an amicable atmosphere in which negotiations proceeded or that he generated a chain of circumstances that led proximately to the sale." *Buck*, 243 A.D.2d at 684, 663 N.Y.S.2d 635. *Buck*, however, does not contradict the principles set forth above. It in no way relieves the broker of his or her responsibility to bring the parties together on the essential terms of the transaction prior to the termination of the brokerage agreement, in order to earn the right to commissions. Thus in *Buck*, 243 A.D.2d at 684–85, 663 N.Y.S.2d 635, the broker was awarded a commission where the broker

had shown the purchaser the property, the terms of the transaction were undisputed, and the purchaser, herself a licensed broker, affirmatively misled the broker into thinking she was not interested in the property and then closed the deal herself ten days after terminating the brokerage agreement. See also *Realty Investors of USA Inc. v. Bhaidaswala*, 254 A.D.2d 603, 679 N.Y.S.2d 179 (3d Dep't 1998) ("it is settled law that a broker's right to a commission is not dependent upon the execution of a legally enforceable sales contract, so long as the seller and buyer have come to a meeting of the minds on the essential terms of the transaction").

Thus, absent bad faith on the part of the principal, a broker is not entitled to commissions for unsuccessful efforts. See *Sibbald v. The Bethlehem Iron Co.*, 83 N.Y. 378, 383 (1881). Indeed, "the broker may devote his time and labor, and expend his money with ever so much devotion to the interests of his employer, and yet if he fails, if without affecting an agreement or accomplishing a bargain, he abandons the effort or his authority is fairly and in good faith terminated, he gains no right to commissions.... And it matters not that after his failure, and the termination of his agency, what he has done proves of use or benefit to the principal." *Id.*

However, "it is well settled that a broker may be entitled to receive his commission where, though the transaction took place after the broker's agency was terminated, the termination was merely a device by which the principal intended to avoid paying an otherwise payable commission." *Berman & Brickell Inc. v. The Penn Central Corp.*, 1986 WL 9689, * 3 (S.D.N.Y.1986). Factors which courts look at in deciding whether a principal has acted in bad faith to avoid payment of a commission include evidence of defendant's good faith negotiations with prospective purchasers, evidence that defendant interfered in some way with plaintiff's attempts

to perform under the brokerage contract prior to its termination, the passage of time between the termination of the brokerage agreement and the signing of the contract in question, and the difference in terms between those proposed by the broker and those finally agreed to. *See e.g. Thomson McKinnon Securities Inc. v. Cioccolanti,* 161 A.D.2d 523, 524, 555 N.Y.S.2d 792 (1st Dep't 1990); *Freda Green & Associates v. Heydt,* 167 A.D.2d 328, 562 N.Y.S.2d 79 (1st Dep't 1990).

▪ Plaintiff Air Support fails to present facts sufficient to reasonably support the conclusion that it earned its right to commissions on the SAS lease. No agreement had been reached on any terms as of the date the First Contract terminated, and SAS was not "ready, willing and able" to consummate the transaction at that time. That a lease between SAS and Atlas was ultimately signed does not alter the fact that Air Support was not able to bring the parties together on terms that were mutually acceptable during the term of the First Contract.

The parties dispute whether Atlas had ever seriously entertained entering into a risk-sharing lease arrangement with SAS. However, this factual issue is immaterial because it is undisputed that, as of April 3, 1995, negotiations between SAS and Atlas on the lease proposal initiated by Air Support ceased, and there was no agreement between the parties on any terms as of the date Air Support's First Contract was terminated. Air Support has presented no evidence, other than its own conjecture, that Atlas terminated the First Contract for the purpose of depriving Air Support of its commissions on the SAS lease, or that Atlas acted in bad faith by refusing to negotiate with SAS or by interfering with Air Support's negotiations with SAS.

Air Support undeniably put a great deal of time and effort into its attempt to broker a lease with SAS. Its documented efforts to make a deal with SAS are undisputed. However, Air Support, by entering into a brokerage agreement which either party could terminate upon thirty days' notice, took the risk that it would invest its resources in an attempt to obtain a lease which might be unsuccessful during the period when Air Support served as Atlas's broker. Absent evidence that Atlas refused to negotiate with SAS and terminated the First Contract in bad faith for the purpose of depriving Air Support of its rightful commissions, Atlas is not liable to Air Support for commissions on a lease signed on different terms, six months after the termination of Air Support's contract with Atlas. That the lease ultimately signed was the goal of Air Support's efforts throughout the negotiation process does not alter the fact that these terms were not agreed upon during the existence of the First Contract. In sum, absent bad faith on the part of Atlas, Air Support cannot be rewarded for efforts which were unsuccessful during its tenure as Atlas's broker. Thus, summary judgment is granted to defendant Atlas on Air Support's First and Second Claims for SAS commissions.

### B. The Varig Claim

▪ Plaintiff's motion for summary judgment granting its Fourth Claim for Varig lease commissions is denied because the Second Contract is ambiguous and based on the evidence presented, a reasonable jury could find that either party's interpretation of the Second Contract is correct. On its face, the Second Contract is ambiguous as to whether it was meant to be limited to only the Varig lease in place at the time the Second Contract was executed or to future leases with Varig as well. Atlas has offered evidence that the lease signed with Varig was on terms different from the lease that was in place when the Second Contract was signed. Atlas has also shown that the dates of the Second Contract match the dates of the Varig lease then in place. However, as Air Support notes, the Second Contract refers to Varig *leases,* in plural form. Sufficient evidence has been presented by

both parties that a reasonable jury could accept either party's interpretation of the Second Contract and thus summary judgment on Air Support's Fourth Claim will be denied.

### C. The Aerofloral Claim

Defendant seeks summary judgment dismissing plaintiff's Eighth Claim for commissions based on revenue obtained by Atlas from its arrangement with Aerofloral. Any agreement Atlas had with Aerofloral clearly does not fall within the Second Contract. Neither Aerofloral nor the airline whose planes its cargo was to fill are Chilean air carriers. Plaintiff seems to be arguing that it is entitled to commissions derived from any revenue Atlas received from any party which Atlas met through Air Support. This is not what the parties agreed to in the Second Contract. Therefore, summary judgment is granted to the defendant dismissing plaintiff's Eighth Claim.

### D. The Fast Air Claim

Plaintiff seeks summary judgment on its Sixth Claim awarding it remaining unpaid commissions due on the Fast Air lease, which expired on December 31, 1997, and which Air Support undisputably procured during the term of the Second Contract. Atlas paid Air Support commissions on this lease with Fast Air, a Chilean carrier, until October 31, 1996, the date when the Second Contract expired. The Second Contract clearly provides for commission payments to be made to Air Support for leases signed with any Chilean carrier, and there is no evidence that such payments were meant to cease with the end date of the Second Contract. Indeed, Atlas's own officer, David McElroy, agreed that it was his "business understanding" that Air Support "would be entitled to commissions through December 31, 1997." No evidence has been introduced to the contrary. Summary judgment is therefore granted to the plaintiff on its Sixth Claim for Fast Air commissions.

### CONCLUSION

For the reasons stated above, defendant Atlas is granted summary judgment dismissing plaintiff's First and Second Claims for SAS commissions. Summary judgment is also granted to defendant dismissing plaintiff's Eighth Claim for commissions arising out of revenue defendant obtained through use of Aerofloral. Plaintiff is granted summary judgment on its Sixth Claim for Fast Air commissions, but is denied summary judgment on its First Claim for SAS commissions, as to which summary judgment has been granted to Atlas, and denied summary judgment on its Fourth Claim for commissions arising out of the October 31, 1996 Lease with Varig.

The parties are directed to file a Joint Pretrial Order by July 9, 1999. The case will be marked ready for trial as of that date. The parties are further ordered to contact this Court's case manager by June 23, 1999, to indicate whether they would like to continue with mediation.

**SO ORDERED.**